**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-02941-CMA-STV

RYAN PARTRIDGE,

Plaintiff,

v.

JOE PELLE, in his official capacity as Boulder County Sheriff; *et al.*,

Defendants.

_____

**RESPONSE TO SHERIFF'S DEFENDANTS' MOTION TO DISMISS [Doc. 48]**
_____

Plaintiff Ryan Partridge, through his counsel David A. Lane and Reid Allison of

KILLMER, LANE & NEWMAN, LLP, and Kathryn Stimson of STIMSON GLOVER STANCIL LEEDY,

LLC, submits this Response to the Sheriff's Defendants Motion to Dismiss [Doc. 48].

**I.    Introduction**

Ryan Partridge was a pretrial detainee and inmate at the Boulder County Jail

under the care of the Sheriff's Defendants throughout much of 2016. Mr. Partridge has

long suffered from schizophrenia, and the Sheriff's Defendants were well aware of his

severe and deteriorating mental illness, as well as the compulsion to self-harm that his

illness caused. Despite their knowledge of his serious mental illness and his substantial

risk of self-harm, the Sheriff's Defendants did not ensure that Mr. Partridge received

desperately-needed treatment. Instead, Mr. Partridge was left untreated to engage in

various self-harming and suicidal behaviors, including bashing his head into a toilet,

attempting to gouge out his eyes, forcing himself to vomit, jumping head-first off of the

second tier of the jail, and ultimately blinding himself with his own hands. While Mr.

Partridge was suffering obvious and serious mental health crises and repeatedly harming himself, some of the Sheriff's Defendants beat and tased him in egregious uses of excessive force. Mr. Partridge entered the Boulder County Jail in early 2016 suffering known and obvious mental health crises; he left the care of the Sheriff's Defendants as a blind person, having been punched and tased rather than treated.

## II.    Factual Background

As alleged in Mr. Partridge's Complaint, the facts are as follows.

### A. The Sheriff's Defendants' had knowledge of Mr. Partridge's untreated mental health crises and repeated instances of self-harm in the Boulder County Jail.

Mr. Partridge suffers from schizophrenia, including "psychosis, auditory and visual hallucinations, delusions, and paranoia." [Doc. 1], *Complaint*, ¶ 15. In 2015 and 2016, as Mr. Partridge's mental health deteriorated, he was arrested multiple times, and on each occasion he was detained at the Boulder County Jail. *Id.* ¶ 18.

Based on these previous detentions at the jail, by early 2016, Mr. Partridge was "well known to the Boulder County Jail staff and has a history of mental health issues, which has been deteriorating considerably, with each passing incarceration." *Id.* ¶ 19. When Mr. Partridge was taken to the jail in February 2016, his mental illness was so obvious that deputies noted that he was more mentally ill than he had been during previous detentions in the jail, and that he was psychotic and acting bizarrely. *Id.*

Soon after his detention at the jail, Mr. Partridge told Boulder County Jail deputies that "the CIA was telling him to 'dig out his eyes,'" and Mr. Partridge attempted to do so. *Id.* ¶ 20. Around this time, Mr. Partridge intentionally bashed his head on the

2

toilet in his cell, damaging seven of his teeth. *Id.* ¶ 21. Deputies and jail mental health staff were aware that Mr. Partridge had broken his teeth. *Id.*

In late February and early March 2016, Mr. Partridge's mental health continued to deteriorate. On February 25, 2016, a deputy told mental health worker Defendant Levett that Mr. Partridge was psychotic. *Id.* ¶ 22. Days later, Mr. Partridge asked Defendant Berringer if he had come to his cell to kill him. *Id.* ¶ 23. Mr. Partridge then told mental health workers at the jail that he had suicidal thoughts. *Id.* ¶ 25. Jail mental health workers described Mr. Partridge as unstable and worried about his "ability to keep himself safe." *Id.* Mr. Partridge was then prescribed anti-psychotic medication. *Id.* On March 9, 2016, a Boulder County Court judge overseeing Mr. Partridge's misdemeanor case ordered him to the state mental hospital. *Id.* ¶ 26.

Less than a month later, on March 22, 2016, deputies saw Mr. Partridge attempting to gouge out his eyes. *Id.* ¶ 28. In response to this self-harming behavior, deputies put Mr. Partridge in a restraint chair, and though he had been compliant, they put a "spit sock" on his head. *Id.* Mr. Partridge then began to spit, and Defendant Mitchell tased Mr. Partridge while he was restrained in the restraint chair. *Id.*

After attempting to gouge out his eyes for the second time at the Boulder County Jail, Mr. Partridge's mental health crisis deepened. A mental health worker filed an Emergency Mental Illness Report and Application, stating that Mr. Partridge was "currently presenting with psychotic symptoms, recently attempted suicide by gouging eyes out and is a danger to himself and in need of in-patient treatment." *Id.* ¶ 29. On March 28, 2016, a Boulder District Court Judge ordered Mr. Partridge to be civilly committed after finding that he was mentally ill and a danger to himself, others, or was

3

gravely disabled. *Id.* ¶ 30. That same day, the Boulder County Jail transported Mr. Partridge to the emergency room at Boulder Community Hospital. *Id.* ¶ 31. During his initial evaluation at the hospital, Mr. Partridge again attempted to gouge out his eyes. *Id.*

On March 29, 2016, Mr. Partridge was forcing himself to vomit at the jail. *Id.* ¶ 32. He told deputies that his food was being poisoned by the jail and that he was hearing voices. *Id.* A mental health worker saw Mr. Partridge making himself vomit and heard him make psychotic statements. *Id.* Multiple deputies, including Defendant Mecca, put on full riot gear and pinned Mr. Partridge against the wall. *Id.* The deputies then placed Mr. Partridge in a restraint chair without incident. *Id.*

In September 2016, Mr. Partridge was returned to the Boulder County Jail after violating the terms of his probation. *Id.* ¶¶ 33-34. The arresting officer wrote on a Boulder County Jail intake form that "Mr. Partridge suffers from mental illness and is talking to himself in an accent." *Id.* ¶ 35.

On September 15, 2016, Mr. Partridge informed Defendant Groff and a jail nurse that he had been diagnosed with schizophrenia, and he asked to see mental health. *Id.* ¶ 36. When he met with Defendant Levett the next day, Mr. Partridge spoke in an Irish accent and told her that the judge could hear his thoughts, that he wanted to make his mother his puppet, and that he was experiencing delusions. *Id.* ¶ 37. On the same day, his attorney raised concerns about Mr. Partridge's competency, and Mr. Partridge screamed that he was "not crazy," in the court and in the holding cell at the courthouse. *Id.* Boulder County deputies witnessed his behavior and noted it in his jail records. *Id.*

During this time period, Mr. Partridge wrote multiple nonsensical kites to mental health staff at the Boulder County Jail. *Id.* ¶¶ 39-40. Defendant Amanda Taylor, a

4

mental health worker at the jail, noted that Mr. Partridge had a previous psychotic episode at the jail, was diagnosed as schizophrenic, was not taking medications, and could begin to decompensate. *Id.* ¶ 39. During this period, mental health workers at the jail noted that Mr. Partridge was in a manic phase and had not been sleeping. *Id.* ¶ 42.

On October 30, 2016, jail employees noted that Mr. Partridge was behaving erratically and that he was delusional and detached from reality. *Id.* ¶ 43. Mr. Partridge told a jail officer that he was scared that the officer was going to starve him to death or kill him. *Id.* Multiple deputies witnessed this behavior, and he was moved to a disciplinary module. *Id.* Jail records noted Mr. Partridge's "[d]elusional behavior." *Id.* The next day, Defendant Smith asked Mr. Partridge if he wanted juice, and Mr. Partridge replied "[y]ou're trying to make it look like I killed my family, aren't you?" and mumbled words Defendant Smith could not understand. *Id.* ¶ 44.

On November 1, 2016, Mr. Partridge spent the day pacing the room and talking to himself, and the defendants knew him to be schizophrenic, delusional, untreated, and suicidal (after his previous attempts at self-harm). *Id.* ¶ 45. Despite this knowledge, Defendants Contreras, Mecca, and Stevens allowed Mr. Partridge to walk on the second tier of the jail. *Id.* Mr. Partridge attempted suicide by jumping headfirst off of the second-floor railing.[1] *Id.* He suffered fractures to his lumbar spine and ribs. *Id.*

Mental health workers examined Mr. Partridge in the days after his suicide attempt and noted that he was suffering delusions, paranoia, and auditory hallucinations. *Id.* ¶¶ 47-48. Despite these facts, Defendants Groff and Levett cleared him from special housing just over a week after his suicide attempt. *Id.* ¶ 49.

---

[1] Defendant Contreras referred to Mr. Partridge as "Parachute Partridge" after his suicide attempt. *Id.*

On November 17, 2016, Mr. Partridge was found competent to proceed and was sentenced for a previous incident involving his father. *Id.* ¶ 50. Mr. Partridge's parents, his defense counsel, and the prosecutor requested a sentence of time-served so that Mr. Partridge could receive desperately necessary mental health treatment, and the judge sentenced him to 6-months work release. *Id.* When he was returned to Boulder County Jail, Mr. Partridge's mother called Defendant Levett and said that she was "scared for him" as he appeared to be "retreating in his own mind again." *Id.* ¶¶ 50-51.

Despite Mr. Partridge's ongoing, untreated mental health crisis, as well as his previous self-harming behavior and suicide attempt, he was again allowed to walk free on the second tier of the jail. *Id.* ¶ 52. He climbed up on the railing again but did not jump before he was handcuffed and moved by to special population housing. *Id.* On December 3, 2016, a day after several of the Sheriff's Defendants beat and tased Mr. Partridge in an egregious instance of excessive force (described below), Defendant Levett noted the jail mental health staff's concern that Mr. Partridge was "going to decompensate quickly," particularly because his "history is that he can mentally go downhill quickly and become in a severe mental state." *Id.* ¶ 55.

On December 6, 2016, Defendant McGurk attended a court hearing and requested the court send Mr. Partridge to the Colorado Mental Health Institute at Pueblo ("CMHIP") and that he be "bumped to the top of the list for his safety and staff safety." *Id.* ¶ 56. Two days later, Mr. Partridge was still at the Boulder County Jail and was punched and tased, as described below, by jail deputies. *Id.* ¶ 57. Soon after this incident, Mr. Partridge's parents again contacted Defendant Levett to express concern about his mistreatment, as well as their fear that he would "die in the jail." *Id.* ¶ 58.

6

Throughout the first weeks of December, Mr. Partridge regularly refused to put on clothes, leave his cell, or respond to jail staff verbally or non-verbally. *Id.* ¶ 59. He vacillated between days without sleep and days during which all he did was sleep. *Id.* On December 16, 2016, Defendant McGurk faxed an affidavit to the Boulder County Attorney detailing Mr. Partridge's urgent need for psychiatric treatment. *Id.*¶ 61. Defendant McGurk stated that he believed Mr. Partridge's "condition has deteriorated and will continue to deteriorate," and that Mr. Partridge "is a danger to himself and/or others." *Id.* A Boulder District Court Judge then signed an order for a mental health evaluation of Mr. Partridge after finding probable cause that he was "mentally ill, and as a result of such mental illness, is an imminent danger to himself or others." *Id.* The District Court Judge ordered that the Boulder County Sheriff's Office transport Mr. Partridge to CMHIP for emergency evaluation and treatment. *Id.* ¶¶ 62-63.

Mr. Partridge was not taken to CMHIP. *Id.* ¶ 65. Nearly a day after the emergency order to take Mr. Partridge to CMHIP, on the afternoon of December 17, his parents contacted the Boulder County Jail and begged the jail to send him to CMHIP or to make him take his medication. *Id.* ¶ 66. Though a note was put in Mr. Partridge's record to have a "prescribing physician" see him, no visit ever happened. *Id.* ¶¶ 67-68.

Instead, at around 9 p.m. on December 17, Defendant Berringer noticed that Mr. Partridge had dried blood on his face that appeared to come from his eye. *Id.* ¶ 69. Defendant Smith told Defendant Berringer that he and Defendant Greene had noticed the same thing around 7:45 p.m. *Id.* ¶¶ 69-70. None of the defendants did anything to examine Mr. Partridge further or help him. *Id.* ¶¶ 69-70.

7

An hour later, Defendants Berringer and Smith noticed a significant amount of blood and fluid coming from Mr. Partridge's swollen eyes. *Id.* ¶ 71. All of the responding deputies knew that Mr. Partridge suffered serious mental illness and had harmed himself and attempted to harm himself, including multiple attempts to gouge out his eyes, on numerous occasions while in custody at the Boulder County Jail. *Id.* ¶ 74.

Mr. Partridge was taken to the Boulder Community Hospital Emergency Room and was referred from there to Denver Health Medical Center—a Level 1 trauma center. *Id.* ¶¶ 75, 77. Dr. Frank Siringo stated that there was no known treatment for Mr. Partridge's injury and that he is permanently blind in both eyes. *Id.* ¶79.

### B. Boulder County has a custom, practice, and policy of deliberate indifference to inmates' serious mental illness.

Defendant Sheriff Pelle and the supervisory staff at the jail, including Defendants Haas and Goetz, have established a practice and policy of not requesting or providing involuntary medication or sending mentally ill inmates to hospitals where they can be treated properly. *Id.* ¶ 88. Moreover, the Defendant supervisors have a practice and policy of not ensuring sufficient monitoring of seriously mentally ill inmates, including those who are going untreated in the jail. *Id.*

Boulder County Jail officials have repeatedly, publicly admitted that they struggle with mentally ill inmates, have a lack of funding to deal with them, and have been understaffed with mental health workers capable of caring for mentally ill inmates. *Id.* ¶¶ 90-91. Indeed, a 2016 independent report on the jail found inadequate mental health services for inmates, understaffing of mental health workers, and a chronic refusal to treat inmates with serious mental health issues. *Id.* ¶ 92.

8

### C. Individual Sheriff's Defendants' engaged in repeated excessive force against Mr. Partridge.

In addition to the Defendants' deliberate indifference to Mr. Partridge's serious mental health needs, multiple individual Sheriff's Defendants repeatedly engaged in excessive force against Mr. Partridge. On March 3, 2016, while Mr. Partridge was in the midst of an obvious, untreated mental health crisis, Defendant Hollonds punched him in the face after Mr. Partridge slipped out of his cell. *Id.* ¶ 24. After Defendant Hollonds had wrestled Mr. Partridge to the floor, he continued punching Mr. Partridge in the head. *Id.* While being moved to a disciplinary cell after this incident, Mr. Partridge stopped walking. *Id.* Deputies pinned Mr. Partridge against the door, and while Mr. Partridge was pinned, Defendant Groff tased Mr. Partridge. *Id.*

On March 22, 2016, at around 1 a.m., deputies escorted Mr. Partridge out of his cell so that it could be cleaned. *Id.* ¶ 27. Upon returning to the cell, Mr. Partridge stuck his hand in the door so that it would not close. *Id.* Defendant Maumau punched Mr. Partridge in the chest and told him to move his hand. *Id.* Mr. Partridge did not do so, and Defendant Maumau tased his fingers. *Id.* Later that day, Defendant Mitchell tased Mr. Partridge while he was restrained in a restraint chair, after Mr. Partridge again attempted to gouge out his eyes. *Id.* ¶ 28.

Later in 2016, less than a month after Mr. Partridge attempted suicide by jumping off of the second-floor railing and a day after he had climbed the railing again, Mr. Partridge's attorney came to visit him. *Id.* ¶ 53. While suffering severe paranoia and delusions (including that the deputies were trying to kill him), Mr. Partridge allegedly

swung at a deputy.[2] *Id.* Defendants Hicks and Newcomb punched Mr. Partridge in the face. *Id.* When Mr. Partridge was on the ground and surrounded by multiple deputies, Defendant Hicks continued to punch Mr. Partridge. *Id.* While Mr. Partridge was on the ground being punched by deputies, Defendants Groff and Koger each tased him. *Id.*

The excessive force continued less than a week later when Defendant Sisneros punched Mr. Partridge and Defendant Groff tased him, in response to Mr. Partridge's failure to comply with their handcuffing him. *Id.* ¶ 57. Just over a week after this incident, Mr. Partridge suffered punches and a tasing at the hands of Defendants Clem and Koger. *Id.* ¶ 60. The officers went into Mr. Partridge's cell to provoke him, and they yanked his blanket off of his naked body. *Id.* Mr. Partridge jumped up, screamed nonsense, and moved toward the door, at which point Defenant Clem punched Mr. Partridge, and Defendant Koger tased Mr. Partridge (for the third time in two weeks). *Id.*

Finally, on the night of December 17, 2016, after Mr. Partridge had blinded himself and was covered in blood, Defendant Smith slammed Mr. Partridge to the ground and Defendant Maumau tased him, claiming that Mr. Partridge—blind and covered in blood—did not comply with their attempt to handcuff him. *Id.* ¶ 72.

### III.    <u>Standard of Review</u>

The Federal Rules of Civil Procedure allow a defendant to file a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "There is a strong presumption *against* the dismissal of claims under this rule." *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008) (citing *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999)) (emphasis

---

[2] Charges were filed against Mr. Partridge for this encounter, but they were later dismissed. *Id.* ¶ 54.

added). When a defendant files a Rule 12(b)(6) motion to dismiss, a court must accept as true "all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (citation omitted). Generally, a complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*; *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

"Asserting a qualified immunity defense via a Rule 12(b)(6) motion[] subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). "In reviewing a Rule 12(b)(6) motion in the context of qualified immunity, a district court should not dismiss a complaint 'for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Peterson*, 371 F.3d at 1201-02 (quoting *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001) (internal quotations omitted)).

## IV.    Argument

Mr. Partridge's detailed 226-paragraph Complaint demonstrates that the Sheriff's Defendants were deliberately indifferent to Mr. Partridge's serious medical needs and engaged in routine, repeated uses of excessive force against Mr. Partridge. Moreover,

Mr. Partridge has properly alleged that the deliberate indifference he suffered was part

of a custom, practice, or policy established by the supervisory Sheriff's Defendants.

Finally, none of the Sheriff's Defendants are entitled to qualified immunity at this stage

in litigation for their violations of Mr. Partridge's constitutional rights, either through their

deliberate indifference or their repeated uses of excessive force against him.[3]

**A. The Complaint states claims for deliberate indifference against the Sheriff's Defendants.**

i.  Mr. Partridge has adequately pled a deliberate indifference claim (Claim 1) against Defendants McGurk, Levett, Pelle, and Haas for failing to take reasonable steps to prevent him from bashing his head into a toilet.

Under the standard applied to pretrial detainees by *Garcia v. Salt Lake County*,

768 F.2d 303, 307 (10th Cir. 1985)[4], in order to state a claim for failure to provide

medical care and treatment in violation of the Fourteenth Amendment, Plaintiffs must

allege, under the objective component of the test, that: (1) Mr. Partridge's medical

needs were "sufficiently serious" to constitute a deprivation of constitutional dimension,

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and, under the subjective component of

---

[3] The Sheriff's Defendants do not move to dismiss Mr. Partridge's Claim 11 or 12, alleging violations of his rights under the Americans with Disabilities Act and the Rehabilitation Act of 1973, respectively. Therefore, those claims will not be addressed in this response.

[4] This standard has arguably been abrogated by *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), in which the Supreme Court stated that a pretrial detainee bringing an excessive force claim need only show that the force used was objectively unreasonable. Though *Kingsley* dealt with an excessive force claim, other circuits and Magistrate Judge Mix of this Court have concluded that its analysis applies with equal weight to deliberate indifference claims brought by pretrial detainees. *See Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017); *Castro v. Cnty. Of L.A.*, 833 F.3d 1060, 1069-70 (9th Cir. 2016) (*en banc*) (holding that "*Kingsley* rejected the notion that there exists a single 'deliberate indifference' standard applicable to *all* § 1983 claims, whether brought by pretrial detainees or by convicted prisoners.") (emphasis in original); *Eaves v. El Paso Cty. Bd. of Cty. Comm'rs*, Civil Action No. 16-cv-01065-KLM, 2017 U.S. Dist. LEXIS 43307, at *16-17 (D. Colo. Mar. 24, 2017) (Mix, M.J.).

the test, that: (2) the Defendants knew of and disregarded an excessive risk to Mr.

Partridge's health and safety. *Id*. at 837. Viewing the allegations in the Complaint in the

light most favorable to Mr. Partridge and drawing every reasonable inference therefrom,

Mr. Partridge has alleged facts sufficient to support both elements of his Claim 1 against

Defendants McGurk, Levett, Pelle, and Haas.

The objective component of the deliberate indifference standard is satisfied if the

inmate suffers an injury that, objectively, is "sufficiently serious," i.e., an injury that

equates to the "denial of the minimal civilized measure of life's necessities." *Farmer*, 511

U.S. at 834 (internal quotation marks omitted). In his first claim, Mr. Partridge has

alleged that he bashed his head into the toilet in his cell, which severely bloodied his

head and mouth and broke seven of his teeth. *Complaint* ¶ 21. To their credit, the

Sheriff's Defendants do not challenge the seriousness of Mr. Partridge's injuries. *See*

*Sheriff's Defendants' Motion to Dismiss* ("*MTD*"), [Doc. 48] at 6-9.

With respect to the second question, whether a jail official knew about and

disregarded a substantial risk to a detainee's health is a question of fact that may be

proven from circumstantial evidence. *Walton v. Gomez (In re Estate of Booker)*, 745

F.3d 405, 430 (10th Cir. 2014). As such, the subjective knowledge of the Sheriff's

Defendants is best tested at a later stage of litigation. *See McGill v. Corr. Healthcare*

*Cos.*, No. 13-cv-01080, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014). At this stage,

the complaint adequately alleges that Defendants McGurk, Levett, Pelle, and Haas

knew of, and disregarded, an excessive risk to Mr. Partridge's health and safety.

A prison official acts with subjective deliberate indifference, if he (1) is "aware of

facts from which the inference could be drawn that a substantial risk of serious harm

13

exists," (2) actually "draw[s] the inference," and (3) "fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (internal quotations omitted). Although this is "a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id.*

Contrary to the Sheriff's Defendants' argument, Mr. Partridge has pled all elements of his first claim of deliberate indifference against Defendants McGurk, Levett, Pelle, and Haas. With respect to Defendants McGurk and Levett, viewing the allegations in the complaint in the light most favorable to him, and drawing all reasonable inferences therefrom, Mr. Partridge has alleged:

- Defendants McGurk and Levett, along with the rest of the Boulder County Jail staff, were well aware by February 2016 of Mr. Partridge's "history of mental health issues, which [have] been deteriorating considerably, with each passing incarceration." *Complaint* ¶ 19.
- Defendant McGurk was Corrections Program Coordinator for the Boulder County Jail Mental Health Program. *Id.* ¶ 56.
- Defendant Levett was a mental health worker at the jail. *Id.* ¶ 22.
- Mr. Partridge's serious mental illness was so obvious on his return to the jail that deputies noted that he was more mentally ill than he had been during previous detentions. *Id.*
- Jail staff, including mental health staff like Defendants McGurk and Levett, were aware that Mr. Partridge had been on psychiatric medications but was not currently medicated. Jail staff noted that Mr. Partridge was presenting with psychosis and behaving in a bizarre manner. *Id.*
- Mr. Partridge told jail staff that the CIA was telling him to "dig out his eyes." *Id.* ¶20.
- Mr. Partridge attempted to dig out his eyes. *Id.*
- In February 2016, Mr. Partridge intentionally banged his head into the toilet in his cell, severely bloodying his head and mouth and breaking seven of his teeth. *Id.* ¶ 21.
- Jail staff was aware that Mr. Partridge had broken his teeth. *Id.*

In sum, as Mr. Partridge has alleged, Defendants McGurk and Levett, as jail staff tasked with monitoring and treating the mental health of detainees and inmates, knew of

14

Mr. Partridge's obvious mental health condition and risk of self-harm, and they failed to take steps to protect him due to the unconstitutional policies, customs, or practices of Defendants Pelle, Goetz, and Haas. *Id.* ¶¶ 98-103. Given the obviousness of Mr. Partridge's serious mental health condition at the time he reentered the Boulder County Jail in February 2016, *Tafoya*, 516 F.3d at 916, the entire jail staff's considerable previous knowledge of his condition and its deterioration, and his previous statements about and attempt at self-harm, Mr. Partridge has sufficiently alleged that Defendants McGurk and Levett knew of Mr. Partridge's condition and risk to himself before he bashed his head into the toilet in his cell.[5]

Mr. Partridge has also adequately alleged that Defendants McGurk and Levett failed to take reasonable steps to treat Mr. Partridge and prevent him from harming himself. The Sheriff's Defendants argue that the jail "did not ignore" Mr. Partridge's severe mental health crisis. *See MTD* at 8. However, the steps they cite as support for this contention all occurred after Mr. Partridge succeeded in harming himself. *Id.* at 8-9 (noting Mr. Partridge's housing moves, evaluation by mental health workers, transport to Boulder Community Hospital, and placement in a restraint chair in March 2016). Therefore, the Sheriff's Defendants' argument only confirms that there were various available and reasonable means of ameliorating the substantial risk of self-harm that Mr. Partridge's obvious severe mental illness caused him that Defendants McGurk and Levett did not ensure were taken *before* Mr. Partridge did harm himself.

---

[5] Indeed, if Defendants McGurk and Levett (as employees charged with knowing of and caring for the mental health issues of detainees and inmates at the jail) were unaware of a seriously mentally ill inmate whose condition was well-known to jail staff generally, then the Boulder County Jail has even greater problems with providing mental health care than they have been willing to admit publicly. *Complaint* ¶¶ 90-91.

15

Because Mr. Partridge has adequately pled the elements for deliberate
indifference, his Claim 1 should not be dismissed.[6]

ii.    Mr. Partridge has adequately pled a deliberate indifference claim (Claim 5)
against Defendants Contreras, Mecca, Stevens, McGurk, Levett, Pelle, and
Goetz for failing to take reasonable steps to prevent Mr. Partridge from
attempting suicide.

In his fifth claim, Mr. Partridge has adequately pled that Defendants Contreras,
Mecca, Stevens, McGurk, Levett, Pelle, and Goetz were deliberately indifferent to his
serious mental health crisis and the substantial risk that he would attempt suicide, as he
did on November 1, 2016. With respect to Defendants McGurk, Levett, Contreras,
Mecca, and Stevens, viewing the allegations in the complaint in the light most favorable
to him, and drawing all reasonable inferences, therefrom, Mr. Partridge has alleged:

- All of the defendants, along with the rest of the Boulder County Jail staff,
were well aware by February 2016 of Mr. Partridge's "history of mental
health issues, which [have] been deteriorating considerably, with each
passing incarceration." *Complaint* ¶ 19.
- Defendant McGurk was Corrections Program Coordinator for the Boulder
County Jail Mental Health Program. *Id.* ¶ 56.
- Defendant Levett was a mental health worker at the jail. *Id.* ¶ 22.
- Mr. Partridge's serious mental illness was so obvious on his return to the
jail that deputies noted that he was more mentally ill than he had been
during previous detentions. *Id.*
- Jail staff, including mental health staff like Defendants McGurk and Levett,
were aware that Mr. Partridge had been on psychiatric medications but
was not currently medicated. Jail staff noted that Mr. Partridge was
presenting with psychosis and behaving in a bizarre manner. *Id.*
- Mr. Partridge told jail staff that the CIA was telling him to "dig out his
eyes." *Id.* ¶ 20. Mr. Partridge attempted to dig out his eyes. *Id.*
- In February 2016, Mr. Partridge intentionally banged his head into the
toilet in his cell, severely bloodying his head and mouth and breaking

---

[6] Because Mr. Partridge has adequately pled a deliberate indifference claim against
Defendants Levett and McGurk, his official capacity claims against Defendants Pelle
and Haas should also not be dismissed. *Cf. MTD*, at 9 ("[b]ecause . . . [Mr.] Partridge
has failed to plead facts showing an underlying constitutional violation, his official
capacity claims must also be dismissed.").

seven of his teeth. *Id.* ¶ 21. Jail mental health personnel were aware that Mr. Partridge had broken his teeth. *Id.*

- On February 25, 2016, a deputy told Defendant Levett that Mr. Partridge was psychotic and should be housed alone. *Id.* ¶ 22.
- Defendants Levett and McGurk, as mental health staff and leadership at the jail, were aware that Mr. Partridge was moved to a disciplinary module due to his psychotic behavior. *Id.* ¶ 24.
- Mr. Partridge told mental health staff that he was suicidal, and multiple members of the jail's mental health staff noted that he was "unstable" and worried about "his ability to keep himself safe." *Id.* ¶ 25.
- In the middle of March, a Boulder County Court Judge ordered Mr. Partridge to be sent to the state mental hospital. *Id.* ¶ 26.
- Jail staff witnessed Mr. Partridge attempt to gouge out his eyes. *Id.* ¶ 28.
- A mental health worker at the jail filed an Emergency Mental Illness Report and Application that made clear the jail mental health staff's determination that Mr. Partridge was psychotic, had "recently attempted suicide by gouging eyes out and [was] a danger to himself and in need of in-patient treatment." *Id.* ¶ 29.
- A Boulder County District Court Judge then ordered Mr. Partridge to be civilly committed, finding that he was a mentally ill and a danger to himself, others and/or gravely disabled. *Id.* ¶ 30.
- Jail staff transported Mr. Partridge to the hospital that same day. *Id.* ¶ 31.
- At the hospital, Mr. Partridge again attempted to gouge out his eyes. *Id.*
- Upon his return to the jail, deputies and mental health staff witnessed him forcing himself to vomit and making psychotic statements. *Id.* ¶ 32.
- In response to this obvious self-harming behavior, deputies, including Defendant Mecca, placed Mr. Partridge in a restraint chair. *Id.*
- In September 2016, after Mr. Partridge was returned to the jail, he was obviously mentally ill and was talking to himself in an accent. *Id.* ¶ 35.
- Jail staff knew at this time that Mr. Partridge was schizophrenic. *Id.* ¶ 36.
- Mr. Partridge spoke to Defendant Levett in an accent and reported delusions, that he knew the judge could hear his thoughts, and that he wanted to make his mother his puppet. *Id.* ¶ 37.
- In late September 2016, Mr. Partridge wrote multiple nonsensical kites to the jail's mental health staff. *Id.* ¶¶ 39-40.
- Mental health staff knew that Mr. Partridge had a previous psychotic episode at the jail, that he was not on medications, and that he could decompensate. *Id.* ¶ 39.
- At the end of October, jail staff knew that Mr. Partridge was entering a manic phase and had not been sleeping. *Id.* ¶ 42.
- On October 30, 2016, jail staff knew that Mr. Partridge was behaving erratically, was very paranoid, and was growing "more and more distant from reality." *Id.* ¶ 43. Jail staff moved Mr. Partridge to disciplinary housing due to his condition and noted his delusional behavior. *Id.*

- He was "known to be very delusional," and Defendants Contreras, Mecca, and Stevens knew that he was not on medication. *Id.* ¶ 45.
- On November 1, 2016, despite jail and mental health staff's knowledge of Mr. Partridge's obvious, severe, and untreated mental illness and his multiple previous episodes of self-harm in the jail, he was allowed to walk free on the second-floor of the jail. *Id.*
- Mr. Partridge attempted suicide by jumping head-first off of the second-floor railing. *Id.* He suffered fractures to his lumbar spine and ribs. *Id.*

Despite Mr. Partridge's obvious, serious, and untreated mental health issues and his history of talking about and attempting suicide and self-harm, Defendants Contreras, Mecca, and Stevens allowed him to walk free on the second floor of the jail and attempt to kill himself. *Id.* Similarly, as argued in the previous section, Defendants McGurk and Levett knew of Mr. Partridge's serious mental health condition and substantial risk of harm to himself, and yet they did not ensure that he was monitored such that he was not free to walk alone in situations where he could easily attempt suicide. *Id.* ¶¶ 136-137. Viewing Mr. Partridge's allegations in the light most favorable to him and drawing every reasonable inference therefrom, Mr. Partridge has adequately alleged that the defendants were aware of the substantial risk that he would harm himself.

The Sheriff's Defendants' comparison of Mr. Partridge's deliberate indifference claim to the facts of *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015) is entirely inapt. *See MTD* at 11. In *Cox*, an inmate killed himself three days after he was first detained and after he had told multiple jail staff that he was not suicidal. 800 F.3d at 1237-38. In contrast, Mr. Partridge had been detained at the Boulder County Jail for months at a time on multiple occasions, his severe and deteriorating mental illness was well-known to jail officials, he had told jail mental health workers that he was suicidal and delusional, and he had harmed and attempted to harm himself on multiple occasions before his suicide attempt. *See Complaint* ¶¶ 19-22, 25-26, 28-32, 35-39, 43-44.

18

In addition to adequately alleging that the individual Sheriff's Defendants knew of his risk of self-harm, Mr. Partridge has adequately alleged that the individual Sheriff's Defendants failed to take reasonable steps to prevent him from attempting suicide. The Sheriff's Defendants do not argue otherwise with respect to this claim. *See* MTD at 9-11. As a response to Mr. Partridge's obvious substantial risk of self-harm, at least one reasonable step is apparent: Mr. Partridge should not have been allowed to walk free on the second floor of the jail, from where it was foreseeable that he would attempt to kill himself. Finally, because Mr. Partridge has adequately pled a deliberate indifference claim against Defendants Contreras, Mecca, Stevens, Levett, and McGurk, his official capacity claims against Defendants Pelle and Goetz should also not be dismissed. *Cf. MTD*, at 11 ("[b]ecause . . . [Mr.] Partridge has failed to plead facts showing an underlying constitutional violation, his official capacity claims must also be dismissed.").

    iii.   Mr. Partridge has adequately pled a deliberate indifference claim (Claim 10) against all Sheriff's Defendants for failing to take reasonable steps to prevent Mr. Partridge from blinding himself by gouging his eyes.

In his tenth claim, Mr. Partridge has properly pled that all of the Sheriff's Defendants were deliberately indifferent to his serious mental health condition and the substantial risk that he would harm himself, as he did on December 17, 2016 by gouging his eyes and permanently blinding himself. With respect to Defendants Koger, Groff, Contreras, Mecca, Stevens, Hicks, Newcomb, Sisneros, Clem, Maumau, Hollonds, and Mitchell (whom the Sheriff's Defendants assert were not present at the jail on December 17, 2016, *see MTD* at 13-15), as well as Defendants McGurk and Levett, viewing the allegations in the complaint in the light most favorable to him, and drawing all reasonable inferences, therefrom, Mr. Partridge has alleged the shared

knowledge of Mr. Partridge's obvious mental illness and substantial risk of self-harm, up

to and including his suicide, as described above on pages 16 and 17. In his Claim 10,

based on his blinding himself with his fingers, Mr. Partridge has also alleged that:

- The day after his suicide attempt, Defendant Levett noted that Mr. Partridge was suffering delusions and paranoia. *Id.* ¶ 47.
- Just over a week after Mr. Partridge's suicide attempt, Defendant Levett and Groff cleared him from special population housing. *Id.* ¶ 49.
- On November 17, 2016, Mr. Partridge's severe, untreated mental illness and his substantial risk of harm to himself was so obvious, that the prosecution joined with Mr. Partridge's family and defense attorney in requesting that he be sentenced to time served in his misdemeanor case, so that he could be allowed to receive desperately-needed mental health treatment. *Id.* ¶ 50. Despite this request, Mr. Partridge was sentenced to 6 additional months in Boulder County Jail. *Id.*
- After his sentencing, Mr. Partridge's mother contacted Defendant Levett and told her that she was "scared for him," because he appeared to be "retreating into his own mind again." *Id.* ¶ 51.
- On December 3, 2016, Defendant Levett noted the mental health staff's concern that Mr. Partridge was going to decompensate quickly, in light of his history of going "mentally [] downhill quickly and becom[ing] in a severe mental state." *Id.* ¶ 55.
- On the basis of Mr. Partridge's extensive history of severe mental illness and substantial risk of self-harm, on December 6, Defendant McGurk went to court to request that Mr. Partridge be sent to CMHIP as soon as possible "for his safety and staff safety." *Id.* ¶ 56.
- Days later, Mr. Partridge remained untreated in the Boulder County Jail, and his parents contacted Defendant Levett, concerned about his mistreatment and scared that he would "die in the jail." *Id.* ¶ 58.
- Throughout this time, jail staff were aware that Mr. Partridge had become non-responsive, refused to put on clothes, and vacillated between days without sleep and days of nothing but sleep. *Id.* ¶ 59.
- Knowing his condition, Defendants Clem, Koger, and Groff, along with other deputies, attempted to provoke Mr. Partridge on December 16, 2016. *Id.* ¶ 60. After these defendants entered Mr. Partridge's cell and yanked the blanket from his naked body, Mr. Partridge jumped up and screamed nonsense. *Id.* The defendants then beat and tased Mr. Partridge. *Id.*
- Also on December 16, Defendant McGurk filed an affidavit detailing the need to take Mr. Partridge to CMHIP as soon as possible for "his safety and staff safety," because his condition was continuing to deteriorate and he had become a danger to himself. *Id.* ¶ 61. A Boulder District Court Judge then ordered Mr. Partridge taken to CMHIP to receive emergency psychiatric care. *Id.* ¶¶ 62-63.

20

- Mr. Partridge was never taken to CMHIP. *Id.* ¶ 65.
- On the afternoon of December 17, 2016, approximately a day after the court had ordered Mr. Partridge to be transported from the jail to CMHIP, his parents called the jail and begged that he be taken to CMHIP, made to take his medication, or at least be seen by a doctor. *Id.* ¶ 66. None of these steps was ever taken. *Id.* ¶ 68.
- Later that night, Mr. Partridge succeeded in blinding himself by gouging his eyes. *Id.* 69-79.

In addition to the above allegations of Mr. Partridge's obvious mental illness and history of self-harm in the jail, of which all of the Sheriff's Defendants were aware, Mr. Partridge has alleged the following against Defendants Berringer, Smith, and Greene:

- At around 9 p.m. on December 17, 2016, Defendant Berringer noticed that Mr. Partridge had blood on the side of his face that appeared to come from his eye. *Id.* ¶ 69. Defendant Smith informed Defendant Berringer that he and Defendant Greene had noticed the blood over an hour earlier. *Id.* ¶¶ 69-70.
- Despite knowing of Mr. Partridge's mental illness and his tendency to self-harm, none of these defendants did anything. *Id.* ¶¶ 69-74.
- An hour later, Defendants Berringer and Smith saw a significant amount of blood and fluid coming from Mr. Partridge's swollen eyes. *Id.* ¶ 71.
- After multiple known attempts to do so in the jail's custody, Mr. Partridge had permanently blinded himself by gouging his eyes. *Id.* ¶¶ 78-79.

In light of this extensive history, and the obviousness of his condition, Mr. Partridge has adequately alleged his final deliberate indifference claim for the events that led to him physically blinding himself. The Sheriff's Defendants' repeatedly argue that by December 17, jail staff was still unaware of Mr. Partridge's substantial risk of self-harm because "[n]ot all mentally ill people are suicidal." *See MTD* at 15-16 (quoting *Shook v. Bd. of Cty. Comm'rs of El Paso*, 543 F.3d 597, 605 (10th Cir. 2008)). While this statement is true, generally, Mr. Partridge has not alleged that the Sheriff's Defendants knew of his risk of self-harm due solely to his mental illness; rather, Mr. Partridge has alleged that the Sheriff's Defendants knew he was a danger to himself because of his mental illness, his statements about self-harm and being suicidal, and

his repeated self-harm and attempted self-harm, including multiple previous attempts to gouge out his eyes and his suicide attempt just over a month before he blinded himself.

Mr. Partridge's allegations detailed above also adequately allege that the Sheriff's Defendants failed to take reasonable steps to protect him despite knowledge of his substantial risk of self-harm. *Tafoya*, 516 F.3d at 916. The Sheriff's Defendants did not ensure that Mr. Partridge received treatment that could keep him from harming himself, whether in the form of voluntary or involuntary medication, transfer to a mental health facility that was actually capable of treating his mental illness, or dedicated monitoring of his condition and behavior to protect him from self-harm. *Complaint* ¶¶ 39, 45, 52, 63-68, 81-86. The mental health "evaluation" that was provided to Mr. Partridge consisted merely of "contact with mental health" workers at the jail, *see MTD* at 14, and was clearly inadequate, in conformance with the supervisory Sheriff's Defendants' custom, policy, and practice of providing insufficient mental health care for seriously mentally ill inmates and detainees at the Boulder County Jail. *See Complaint*, ¶¶ 81-92. Ultimately, the fact that the Sheriff's Defendants provided some medical evaluation, as a matter of law, does not nullify a claim for deliberate indifference, particularly given the fact that the Complaint alleges that the Sheriff's Defendants did not take available reasonable steps to treat him and protect him from self-harm that were obviously needed. *See Id.*; *see also Hunt v. Uphoff,* 199 F.3d 1220, 1223 (10th Cir. 1999).

Implicitly acknowledging their failure to take available reasonable steps, the Sheriff's Defendants contend that they were not required to take steps to treat and protect Mr. Partridge from self-harm because "the Constitution does not 'affirmatively create a right to mental health services or treatment.'" *MTD* at 13 (quoting *Shook v. Bd.*

*of Cty. Comm'rs of El Paso*, 2006 U.S. Dist. Lexis 43882, at *14 (D. Colo. June 28, 2006).[7] However, it has long been clearly established, as the same order recognizes, that the Constitution requires jail officials to treat "medical needs, including mental health needs, of which jail officials are aware." *Shook*, 2006 U.S. Dist. Lexis 43882, at *14. This is precisely what Mr. Partridge has alleged that the Sheriff's Defendants failed to do, in response to his obvious and well-known substantial risk of self-harm.

Mr. Partridge has adequately pled claims of deliberate indifference against the Sheriff's Defendants, and his claims should not be dismissed.

**B. The Sheriff's Defendants are not entitled to qualified immunity for Mr. Partridge's deliberate indifference claims.**

The Sheriff's Defendants also should not be granted qualified immunity from Mr. Partridge's deliberate indifference claims. The doctrine of qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Once a defendant asserts a qualified immunity defense, a two-part burden shifts to the plaintiffs. *See Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000). A Plaintiff must first allege that each Defendant's actions violated a constitutional or statutory right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This determination in the context of a 12(b)(6) motion requires the Court to determine whether a constitutional violation was pled by accepting all allegations as true and evaluating them in the light most favorable to the plaintiff. *Kikumura v. Osagie,* 461

---

[7] The Sheriff's Defendants erroneously cite this Colorado District Court order denying class certification as a 10th Circuit opinion. *MTD* at 13.

F.3d 1269, 1291 (10th Cir. 2006). Next, a Plaintiff must demonstrate that the right at issue was clearly established at the time of Defendants' unlawful conduct. *Harlow*, 457 U.S. at 818. In determining whether the right was "clearly established," the Court must assess the objective legal reasonableness of the action at the time of the alleged violation, and ask whether the right was sufficiently clear that a reasonable individual defendant would understand that what she is doing violates that right. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

"[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). As stated by the Supreme Court in *Estelle v. Gamble*:

> Elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency. . . .

429 U.S. 97, 103 (1976) (citations omitted). The Sheriff's Defendants were on notice that their failure to provide any meaningful treatment to or monitoring of Mr. Partridge, despite obvious signs of his mental health crisis, which repeatedly caused him to harm himself while in the jail, violated his clearly established rights.

It is clearly established in the Tenth Circuit that jail staff would be deliberately indifferent to an inmate's safety if they failed to take reasonable steps to avert the known, substantial risk that the inmate would harm him or herself. *See, e.g.*, *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994). In *Hocker*, the Tenth Circuit

24

determined that jail officials were not deliberately indifferent to an inmate's suicide, only because the jail had no reason to know or infer that the inmate was a suicide risk. *See id.*; *see also Barrie v. Grand County*, 119 F.3d 862, 868-69 (10th Cir. 1997).

In contrast, and as detailed in the previous section, Mr. Partridge's complaint alleges that the Sheriff's Defendants had actual knowledge that Mr. Partridge was suffering from an untreated mental health crisis that was causing him to talk about and attempt to harm himself. Mr. Partridge attempted to gouge out his eyes multiple times and attempted suicide while in the custody of the Sheriff's Defendants. In between these events, Mr. Partridge spoke to individual defendants about his desire to harm himself as well as his suicidal thoughts and behaved in delusional, erratic fashion. *Complaint* ¶¶ 20, 23, 25, 29, 32, 35-40, 43-45, 47-48, 52, 55, 59. The complaint also makes clear that jail staff was well aware of the jail's inability or unwillingness to care for Mr. Partridge, as evidenced by the multiple notations to that effect in the record, Sheriff's Defendants statements about the provision of mental health care, and orders and attempts to transport Mr. Partridge to a facility capable of treating his mental illness and protecting him from himself. *Id.* ¶¶ 19, 25-26, 29-31, 39, 43, 55-56, 61-65, 88-92.

As detailed above, the Sheriff's Defendants failure to provide Mr. Partridge with medical treatment, including involuntary anti-psychotic medication, more frequent monitoring of his behavior, transporting him to a mental health institution, or other available options, constituted deliberate indifference where they knew that he was a danger to himself. *See Hocker*, 22 F.3d at 1000. The complaint adequately alleges that the Sheriff's Defendants violated Mr. Partridge's clearly established rights.

25

Contrary to the Sheriff's Defendants' argument, Mr. Partridge has not alleged that the Boulder County Jail lacked adequate suicide screening protocols. *MTD* at 23-24. Instead, he has alleged that the Sheriff's Defendants did not need additional screening information because they were aware of Mr. Partridge's substantial risk of self-harm but failed to take reasonable steps to ensure that he was treated and protected from himself. As one possible form of treatment, Mr. Partridge alleged that the Sheriff's Defendants could have and should have ensured that he took medication to treat his schizophrenia, whether he expressed a willingness to do so or not. The Sheriff's Defendants appear to contend that they could not have involuntarily treated Mr. Partridge's serious mental health needs as a matter of law. *See MTD* at 26-27. This is an alarming proposition for all those who are and will be suffering untreated mental health crises in the care of the Boulder County Jail.

The Sheriff's Defendants' argument is based on C.R.S. § 27-65-107(1)(c). However, this statutory section applies only to the involuntary treatment of those who are subject to a 72-hour mental health hold, under C.R.S. §§ 27-65-105, 27-65-106. Nothing in the statute indicates that this is the only means of involuntarily medicating individuals or that it also prohibits jail officials from medicating those who are already detained or incarcerated. Mr. Partridge was a pretrial detainee and an inmate serving a sentence in the Boulder County Jail in 2016. Therefore, the statute the Sheriff's Defendants rely on to claim that they could do nothing for Mr. Partridge does not restrict what they could have done in his case. More fundamentally, even if the Sheriff's Defendants were bound by this statutory section, their failure to send Mr. Partridge out to one of the approved facilities so that he could receive the treatment and care he so

26

obviously needed and which they claim to have been unable to provide was itself

deliberate indifference. *See Hocker*, 22 F.3d at 1000; *see also Blackmon v. Sutton*, 734

F.3d 1237, 1245-46 (10th Cir. 2013) (holding that it would be a violation of clearly

established law for correctional officials to fail to send a self-harming inmate to receive

obviously-needed mental health treatment, after the officials determined that they were

unable to provide necessary, effective treatment).

Similarly, the Sheriff's Defendants argue that *Bee v. Greaves*, 744 F.2d 1387,

1395 (10th Cir. 1984), establishes that their Constitutional duty to provide medical care

to Mr. Partridge was somehow limited by the whims of Mr. Partridge, a man who was

suffering from untreated schizophrenia, which had caused him to harm himself on

numerous occasions. *See MTD* at 27. However, the Sheriff's Defendants fail to grapple

with or even note the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210

(1990).  In *Harper*, the Court held that the Due Process Clause permits a state to treat a

prison inmate who has a serious mental illness with antipsychotic drugs against his

will, if the inmate is dangerous to himself or others and the treatment is in the inmate's

medical interest.  494 U.S. at 227. As the Tenth Circuit has noted, "[t]his makes good

sense, for where an inmate is a danger to himself or others, an involuntary medication

policy may be considerably more humane than a policy disallowing the practice

altogether. Prison officials have a duty to care for their inmate population, and using

antipsychotic medications is an appropriate medical response in certain situations."

*Boyett v. Cty. of Wash.*, 282 F. App'x 667, 676-77 (10th Cir. 2008) (unpublished); *see*

*also Carter v. Koprivnikar*, 2016 U.S. Dist. LEXIS 32485, at *9 n.6 (D. Colo. Mar. 14,

2016) (reasoning that "based on Plaintiff's own admission that he was harming himself,

and banged his head to force CDOC personnel to place him in restraints because he 'was enraged and malicious,' it is plausible that a claim for deliberate indifference to medical needs could arise were Defendant to have *not* recommended involuntary medication."). Ultimately, the Sheriff's Defendants quotation of *Bee* for the proposition that "[a]bsent legitimate government objectives . . . involuntary medication may itself amount to unconstitutional punishment," 744 F.2d at 1395, begs the question—Mr. Partridge was obviously a substantial danger to himself, and protecting him from self-harm was indisputably a "legitimate government objective." *Harper*, 494 U.S. at 225-26.

The Sheriff's Defendants are not entitled to qualified immunity for Mr. Partridge's deliberate indifference claims, as they violated his clearly established Constitutional rights by failing to take necessary and available steps to protect him, despite their knowledge of his substantial risk of self-harm.

## C. The Complaint states a claim for supervisory liability against Defendants Pelle, Haas, and Goetz.

Mr. Partridge has adequately pled a supervisory liability claim against Defendants Pelle, Goetz, and Haas, for their complete lack of training and supervision to ensure that seriously mentally ill inmates at the Boulder County Jail receive the treatment that they need to protect them from a known, substantial risk of self-harm. To prevail on his individual capacity claims against Defendants Pelle, Haas, and Goetz based on supervisory liability, Mr. Partridge must establish that: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

28

A supervisor can be held liable "in situations where an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993)). But "[p]ersonal involvement [in a constitutional violation] does not require direct participation because § 1983 states any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (citation omitted). For instance, "where an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application." *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1264 (D. Colo. 2010) (Brimmer, J.). In such a situation, the supervisor "set in motion a serious of events that he knew or reasonably should have known would cause his officers to violate [the plaintiff's] constitutional rights." *Id.* at 1263.

Mr. Partridge has sufficiently pled that Defendants Pelle, Goetz, and Haas adopted a "plan or policy – express or otherwise – showing [their] authorization or approval of [their subordinate Defendants'] misconduct." *Dodds*, 614 F.3d at 1200-01. As detailed above, Mr. Partridge has alleged that Boulder County Jail staff were well aware of his obvious, untreated, and severe mental health crises, as well as his attendant discussions of and attempts at self-harm. Despite this widespread, shared knowledge, the Complaint alleges that:

- The Sheriff's Defendants' deliberate indifference to Mr. Partridge's obvious serious medical needs and substantial risk of self-harm was part of a broader culture of deliberate indifference at the jail. *Complaint* ¶ 87.

- The supervisory Sheriff's Defendants had a practice and policy of not seeking to involuntarily medicate seriously mentally ill inmates or of transporting those inmates to outside mental health facilities where they could receive desperately-needed treatment. *Id.* ¶ 88.
- The supervisory Sheriff's Defendants also had a practice and policy of failing to sufficiently monitor seriously mentally ill inmates who were not being treated at the jail. *Id.*
- Defendant McGurk explained these policies to doctors at Denver Health on December 22, 2016. *Id.* Defendant McGurk told doctors that the jail did not want inmates like Mr. Partridge because they require monitoring and housing alone. *Id.*
- A doctor offered to provide a certification to Defendant McGurk so that the jail could obtain court-ordered medications for its inmates. *Id.* However, Defendant McGurk declined, despite the fact that other jails, including Denver County Jail, often request court-ordered medication. *Id.*
- The supervisory Sheriff's Defendants have publicly admitted that they are not able to treat and protect mentally ill inmates. *Id.* ¶ 89.
- The Sheriff's Annual Report admits that the jail "struggles" with overcrowding, including "an abundance of individuals in our custody with mental health needs." *Id.* ¶ 90. The report also admits that the presence of inmates with serious mental health needs complicates overcrowding. *Id.*
- In an interview, Defendant Mitchell admitted that the jail's "resources are too strapped." *Id.* ¶ 91. Moreover, Defendant Mitchell noted that "[w]e're deputies, not mental health specialists," and that the jail has a hard time housing its mentally ill inmates. *Id.* Finally, Defendant Mitchell admitted that the underfunding and understaffing of mental health workers at the jail, as well as the lack of attention given to mentally ill inmates is "hard on them, and hard on staff." *Id.*
- In 2016, an independent consulting firm concluded that mental health care for inmates at the jail was inadequate. *Id.* ¶ 92. Particularly, the firm determined that mental health staff routinely found ways to "decline serving" seriously mentally ill inmates at the jail. *Id.* The firm noted that there were minimal mental health services because of understaffing of mental health workers. *Id.*
- The consulting firm recommended that the jail offer more treatment for its mentally ill inmates and create a special unit to ensure that the treatment was delivered effectively. *Id.*

These allegations adequately plead that the supervisory Sheriff's Defendants

actively endorsing constitutionally infirm treatment. Defendant Pelle is particularly

responsible for his deputies' unconstitutional conduct, because he is a final policymaker

for Boulder County. *See Cortese v. Black*, 838 F. Supp. 485, 496 (10th Cir. 1993) ("In

30

Colorado a sheriff is an elected county officer, § 30-10-501, 12A C.R.S. (1986), and is responsible for the official acts of his deputies. § 30-10-506. In the context of this case I conclude that the sheriff is properly defined as a final 'policymaker' of the county."); *see also* Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses, § 7.19[C] (4th ed. 2010) (positing that imposing liability upon officials for their promulgation of a policy the enforcement of which violates individuals' federally protected rights holds such officials "responsible for their own wrongs rather than on the basis of respondeat superior liability" and, therefore, comports with *Iqbal*), cited with approval in *Dodds*, 614 F.3d at 1199-200. Statements by Boulder County jail staff, as well as the independent report conducted make clear that officials knew or should have known of the lack of funding and staffing, as well as serious deficiencies in care and the injuries to inmates that would foreseeably result, and this too supports Mr. Partridge's claims against the supervisory Sheriff's Defendants. *See, e.g.*, *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999) (holding Sheriff individually liable where he was aware of the risk of harm to inmates resulting from custom of inadequate supervision, evidenced by past instances of inadequate supervision, and failed to take reasonable measures to prevent it).

Fundamentally, Mr. Partridge's claim is not "identical to the supervisory liability theory advanced and rejected in *Cox*." *MTD* at 21. In *Cox*, the Tenth Circuit held that an inmate who had committed suicide had no clearly established Constitutional right to adequate suicide screening protocols in the jail intake process. *Cox,* 800 F.3d. at 1250. The Court also concluded that the jail officials in the case had not been deliberately indifferent to the inmate's safety because there was no indication that any jail staff had knowledge of the inmate's risk of suicide. *Id.* at 1249-52.

31

Rather than being "identical" to Mr. Partridge's claim, the reasoning and holding
of *Cox* makes clear exactly the adequacy of Mr. Partridge's pleading. The Tenth
Circuit's decision turned on the lack of knowledge of an inmate's risk of self-harm. After
concluding that no jail employee had knowledge of the risk with respect to the inmate in
question, the Court reversed the district court's denial of summary judgment for jail
supervisors. *Cox*, 800 F.3d at 1252 (concluding that "the record . . . does not establish
that *any* identified Jail employee . . . had knowledge that [the detainee] presented a
substantial risk of suicide."). In this case, Mr. Partridge has alleged that the subordinate
jail staff Sheriff's Defendants were well aware of the substantial and ongoing risk that he
would harm himself, as he suffered through his obvious, untreated mental health crises.
Mr. Partridge frequently talked about harming himself, and he did so on multiple
occasions while in the custody of the Boulder County Jail.

In light of the above, Mr. Partridge has adequately pled a claim of supervisory
liability against Defendants Pelle, Haas, and Goetz.

### D. The Sheriff's Defendants who engaged in excessive force against Mr. Partridge are not entitled to qualified immunity.

Mr. Partridge has alleged seven instances of excessive force. Each of these
allegations shares a common theme, namely that Mr. Partridge was restrained or
surrounded by multiple deputies and was subjected to punches and tasings even after
he was under the control of deputies.

When considering a claim of excessive force against a pretrial detainee, the
Supreme Court has made clear that the plaintiff "must show only that the force
purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135
S. Ct. at 2472-73. Courts are to consider "the relationship between the need for the

32

use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 2473. On the other hand, an inmate (rather than a pretrial detainee) alleging a use of excessive force must show that jail officials "acted maliciously and sadistically for the very purpose of causing harm rather than in a good-faith effort to maintain or restore discipline." *Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996). To answer this question, a court considers "the need for [the use of] force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

The individual Sheriff's Defendants are not entitled to qualified immunity on any of Mr. Partridge's seven claims of excessive force. As a fundamental matter common to all of Mr. Partridge's claims, it has been clearly established for years that officers who know of a person's mental illness must take that into account in determining what amount of force is appropriate. *See, e.g., Giannetti v. City of Stillwater*, 216 F. App'x 756, 764-65 (10th Cir. 2007) (agreeing "that a detainee's mental health must be taken into account when considering the officers' use of force" where the officers knew the detainee's condition and collecting cases from other Circuits reaching the same conclusion). Additionally, the Tenth Circuit has made clear that officers who are present during the use of excessive force can be liable for excessive force for failing to prevent their colleagues' use of that force. *In re Estate of Booker*, 745 F.3d at 421.

33

As alleged in the Complaint, the individual Sheriff's Defendants had an egregious habit of tasing and beating a severely mentally ill inmate at times in which he was no threat to anyone and was either restrained or surrounded by multiple deputies. *Complaint* ¶¶ 24, 27, 28, 53, 57, 60, 72. As the Tenth Circuit has noted, a taser is "a weapon that sends up to 50,000 volts of electricity through a person's body, causing temporary paralysis and excruciating pain." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010). Though tasers "may not constitute deadly force, their use unquestionably 'seizes' the victim in an abrupt and violent manner," causing a severe intrusion of the victim's Constitutional rights. *Id.* It is clearly established law that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *In re Estate of Booker*, 745 F.3d at 424 (quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007)).

With respect to the beatings the Sheriff's Defendants inflicted upon Mr. Partridge, it is clearly established law that beating an inmate who is under control and being restrained by another officer is excessive force. *Lowe v. Sockey*, 36 F. App'x 353, 357-359 (10th Cir. 2002). Similarly, any reasonable officer would have known that punching a severely mentally ill inmate on the ground was much more force than necessary. *See Ali v. Dinwiddie*, 437 F. App'x 695, 699 (10th Cir. 2011) (holding that punching an inmate whom the officer had already knocked to the floor could constitute excessive force). Additionally, the named Sheriff's Defendants beating Mr. Partridge while he was restrained, not actively resisting, and not threatening any officer, is a Constitutional violation "so obvious that similar conduct" may seldom arise. *Lowe v. Raemisch*, 864

34

F.3d 1205, 1210-11 (10th Cir. 2017) (making clear that an official's action can violate clearly established law even without precedent with "materially similar" facts).

Mr. Partridge has adequately alleged excessive force in violation of his clearly established rights in each of his seven claims. In Claim 2, Mr. Partridge has alleged:

- Defendants Hollonds and Groff, like the rest of the jail staff, were well aware of Mr. Partridge's severe mental illness. *Complaint* ¶ 19.
- On March 3, 2016, Mr. Partridge was housed in the special management module of the jail due to his psychotic behavior. *Id.* ¶ 24.
- When Defendant Hollonds came to give Mr. Partridge his meal, Mr. Partridge, suffering severe mental illness, slipped out of the door. *Id.*
- Defendant Hollonds punched Mr. Partridge in the face and wrestled him to the ground. *Id.*
- Once Mr. Partridge was on the ground, Defendant Hollonds continued to punch him in the head. *Id.*
- Later that day, when Mr. Partridge was being moved by multiple deputies to a more severe disciplinary cell, he stopped walking. *Id.*
- Multiple deputies pinned Mr. Partridge against a door, and Defendant Groff tased him. *Id.*
- Mr. Partridge did not threaten any deputy in any way before being punched in the face and tased. *Id.*
- The defendants knew that Mr. Partridge's active delusions and psychoses prevented him from complying. *Id.* ¶ 109.

In Claim 3, Mr. Partridge has alleged that:

- Defendant Maumau, like the rest of the Boulder County Jail staff, was well aware of Mr. Partridge's severe mental illness. *Id.* ¶ 19.
- On March 22, 2016 after 1 a.m., while being transported to his cell by multiple deputies, including Defendant Maumau, Mr. Partridge held onto the door of his cell, which prevented it from closing. *Id.* ¶ 27.
- Defendant Maumau punched Mr. Partridge. *Id.*
- Defendant Maumau then told Mr. Partridge, who was suffering obvious mental illness, that he would tase him if he did not let go of the door. *Id.*
- Defendant Maumau then tased Mr. Partridge's fingers. *Id.*
- Mr. Partridge did not threaten Defendant Maumau or any of the other deputies present in any way. *Id.*
- Defendant Maumau knew that Mr. Partridge's severe mental illness prevented him from understanding and complying with orders. *Id.* ¶ 120.

In Claim 4, Mr. Partridge has alleged that later on March 22, 2016:

35

- Defendant Mitchell, like the rest of the Boulder County Jail staff, was well aware of Mr. Partridge's severe mental illness. *Id.* ¶ 19.
- On March 22, 2016, jail staff witnessed Mr. Partridge attempting to gouge out his eyes. *Id.* ¶ 28.
- Deputies restrained Mr. Partridge in a restraint chair without incident. *Id.*
- Once Mr. Partridge was restrained and had a "spit sock" placed over his head, he began to spit into it. *Id.*
- Defendant Mitchell then tased Mr. Partridge. *Id.*
- Defendant Mitchell knew that Mr. Partridge's severe mental illness prevented him from understanding and complying with orders. *Id.* ¶ 129.

Though it is an obvious proposition, *Lowe*, 864 F.3d at 1210-11, it is clearly established law in the 10th Circuit that tasing an inmate who is restrained in a restraint chair is excessive force. *See, e.g., Porro v. Barnes*, 624 F.3d 1322, 1324-25 (10th Cir. 2010).

In Claim 6, Mr. Partridge has alleged that on December 2, 2016:

- Defendants Groff, Koger, Hicks, and Newcomb were well aware of Mr. Partridge's severe mental illness. *Complaint* ¶ 19, 147.
- Multiple deputies went to handcuff Mr. Partridge in order to visit with his attorney. *Id.* ¶ 53.
- Mr. Partridge, believing in his severe mental health crisis that the deputies were there to kill him, allegedly swung at one of the deputies. *Id.*
- Defendants Hicks and Newcomb, as well as multiple other deputies, punched Mr. Partridge in the face. *Id.*
- Once Mr. Partridge was on the ground, Defendant Hicks continued to beat Mr. Partridge. *Id.*
- While Mr. Partridge was on the ground being beaten by Defendant Hicks and was surrounded by multiple other deputies, Defendants Groff and Koger each tased Mr. Partridge. *Id.*
- The beating left Mr. Partridge covered in blood, bleeding from his head, nose, and mouth. *Id.*

Contrary to the Sheriff's Defendants' argument, the Complaint does not "demonstrate that the use of force was in response to [Mr.] Partridge's threat to a deputy's safety." *MTD* at 35. The defendants knew that Mr. Partridge was suffering psychotic delusions, and they continued to beat him and tase him after he was on the ground surrounded by multiple deputies, not threatening any deputy in any way. *Complaint* ¶ 53.

Less than a week later, in Claim 7, Mr. Partridge has alleged that:

- Defendants Sisneros, Koger, and Groff, like the rest of the jail staff, were well aware of Mr. Partridge's severe mental illness. *Complaint* ¶ 19.
- On December 8, 2016, five jail staff, including Defendants Sisneros, Koger, and Groff, went to handcuff Mr. Partridge for a visit. *Id.* ¶ 57.
- After one of his arms was handcuffed, Mr. Partridge, suffering obvious, severe, and untreated mental illness, pulled his hands back into the cell so that only one of his arms was handcuffed. *Id.*
- Defendant Sisneros punched Mr. Partridge. *Id.*
- Defendant Koger tased Mr. Partridge. *Id.*
- Defendant Groff did nothing to stop his colleagues from using excessive force on Mr. Partridge. *Id.*
- The defendants knew that Mr. Partridge's psychosis prevented him from understanding or complying with orders. *Id.* ¶ 159.

In his Claim 8, Mr. Partridge has alleged that:

- Defendants Clem, Koger, and Groff, like the rest of the jail staff, were well aware of Mr. Partridge's severe mental illness. *Complaint* ¶ 19.
- The defendants knew that Mr. Partridge was suffering a manic phase of his severe mental illness and had been spending days not sleeping followed by sleeping all day. *Id.* ¶ 59-60.
- On December 16, 2016, the defendants decided to provoke Mr. Partridge, and Defendant Groff yanked the blanket off of his naked body. *Id.* ¶ 60.
- Mr. Partridge jumped up, screamed nonsense, and started toward the door of the cell. *Id.*
- Defendant Clem punched Mr. Partridge in the chest, Defendant Koger tased him, and Defendant Groff did nothing to prevent his colleagues from using excessive force against Mr. Partridge. *Id.*
- The defendants knew that Mr. Partridge's psychosis prevented him from understanding or complying with orders. *Id.* ¶ 169.

Finally, in his Claim 9, Mr. Partridge has alleged that:

- On December 17, 2016, Defendants Smith and Maumau entered Mr. Partridge's cell after he had blinded himself. *Id.* ¶ 72.
- Mr. Partridge's eyes were swollen shut, and he was covered in blood. *Id.*
- Claiming that Mr. Partridge failed to comply with his handcuffing, Defendant Smith slammed Mr. Partridge to the ground. *Id.*
- Defendant Maumau then tased Mr. Partridge. *Id.*
- The defendants knew that Mr. Partridge's psychosis prevented him from understanding or complying with orders. *Id.* ¶ 179.

It would have been apparent to any reasonable officer that tasing Mr. Partridge in

each of these instances, when he was surrounded by multiple deputies, was not posing

37

a threat to any deputy, and was not actively resisting was much more force than was necessary. *In re Estate of Booker*, 745 F.3d at 424. Though deputies may have felt the need to use some force, the deputies only escalated the severity of their force, rather than tempering it, by tasing him, punching him, and slamming him to the ground when he was restrained and not actively resisting. *Hudson*, 503 U.S. at 7. Similarly, any reasonable jail officer presented with the situations alleged in Mr. Partridge's claims would have known that punching him served no legitimate jail purpose and constituted excessive force. *Lowe*, 36 F. App'x at 357-359; *Ali*, 437 F. App'x at 699. As the individual defendants' repeated beating and tasing of Mr. Partridge while he was suffering mental health crises and restrained was much more force than necessary and done "for the very purpose of causing harm," Mr. Partridge has adequately pled excessive force claims in violation of his clearly established constitutional rights. *Kingsley*, 135 S. Ct. at 2472-73; *Mitchell*, 80 F.3d at 1440.[8]

On this limited record, this Court should not grant any defendant qualified immunity for punching and tasing Mr. Partridge while he was not threatening or actively resisting any jail staff and was restrained and/or surrounded by multiple deputies.

## V.    Conclusion

For the reasons stated above, the Sheriff's Defendants' Motion to Dismiss Mr. Partridge's Claims 1-10 and 13 against them should be denied.

Dated this 30th day of April 2018.

---

[8] The Sheriff's Defendants also argue for qualified immunity from Mr. Partridge's "fifth claim for relief" based on deputies' use of force on March 29. *MTD* at 33. However, Mr. Partridge's Claim 5 is a deliberate indifference claim, and he did not allege an excessive force claim based on the events of March 29. *Complaint* ¶¶ 124-133.

KILLMER, LANE & NEWMAN, LLP


/s/ David A. Lane
David A. Lane
Reid Allison
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
rallison@kln-law.com


Kathryn Stimson
STIMSON GLOVER STANCIL LEEDY LLC
1875 Lawrence St., Ste. 420
Denver, CO 80202
(720) 664-8066
kate@SGSLATTORNEYS.COM

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 30th day of April 2018, I filed this **RESPONSE TO SHERIFF'S DEFENDANTS' MOTION TO DISMISS [Doc. 48]** via CM/ECF, and CM/ECF.  A courtesy copy was sent via email to the following:


Trina Ruhland
Dea Wheeler
Kari Goodnight
David Hughes
Boulder County Attorney's Office
P.O. Box 471
Boulder, CO 80301
truland@bouldercounty.org
dwheeler@bouldercounty.org
kgoodnight@bouldercounty.org
dhughes@bouldercounty.org

Lawrence D. Stone
Jessie M. Fischer
NIXON SHEFRIN HENSEN OGBURN, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
lstone@nixonshefrin.com
jfischer@nixonshefrin.com

*s/ Charlotte Bocquin Scull*
Paralegal
