**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-02941-CMA-STV

RYAN PARTRIDGE,

     Plaintiff,

v.

T. SMITH, in his individual and official capacity;
KARMEN KOGER, in her individual and official capacity;
THOMAS GROFF, in his individual and official capacity;
ROBERT HICKS, in his individual and official capacity;
DAN NEWCOMB, in his individual and official capacity;
CHUCK SISNEROS, in his individual and official capacity;
GREGORY CLEM, in his individual and official capacity;
VILI MAUMAU, in his individual and official capacity;
ANTHONY HOLLONDS, in his individual and official capacity;
LYDIA MITCHELL, in her individual and official capacity
BOULDER COUNTY SHERIFF'S OFFICE.

     Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT ON
THE PLEADINGS [# 119]**

_____

Plaintiff Ryan Partridge, through his counsel David A. Lane and Reid Allison of

Killmer, Lane & Newman, LLP, and Kathryn Stimson of HADDON MORGAN

FOREMAN, LLP, hereby submits this Response to Defendant's Motion for Judgment on

the Pleadings [Doc. # 119], and in support thereof states:

## I.  Introduction

Ryan Partridge was a pretrial detainee and inmate at the Boulder County Jail in

Boulder County's care throughout much of 2016. Mr. Partridge has long suffered from

schizophrenia, and the Boulder County employees at the jail were well aware of his

severe and deteriorating mental illness. They also knew of the compulsion to self-harm that his illness caused. Unfortunately, Boulder County has wholly deficient training and supervision with respect to dealing with mentally ill detainees. Despite the jail's knowledge of Mr. Partridge's serious mental illness and his substantial risk of self-harm, the Sheriff's Office refused to accommodate him, by ensuring that he receive desperately-needed treatment, moving him to a mental health facility that could care for him, or at least not repeatedly provoking him and using wholly unnecessary force on him. Instead, Mr. Partridge was left untreated to engage in various self-harming and suicidal behaviors, and untrained and unsupervised jail staff repeatedly refused to accommodate his known disabilities while engaging in egregious uses of force.

## II.  Facts Alleged

Mr. Partridge suffers from schizophrenia, including "psychosis, auditory and visual hallucinations, delusions, and paranoia." [Doc. 1], *Complaint*, ¶ 15. In 2015 and 2016, as Mr. Partridge's mental health deteriorated, he was arrested multiple times, and on each occasion he was detained at the Boulder County Jail. *Id.* ¶ 18. Based on these previous detentions at the jail, by early 2016, Mr. Partridge was "well known to the Boulder County Jail staff and has a history of mental health issues, which has been deteriorating considerably, with each passing incarceration." *Id.* ¶ 19. When Mr. Partridge was taken to the jail in February 2016, his mental illness was so obvious that deputies noted that he was more mentally ill than he had been during previous detentions in the jail, and that he was psychotic and acting bizarrely. *Id.*

In late February and early March 2016, Mr. Partridge's mental health continued to deteriorate. On February 25, 2016, a deputy told mental health worker Defendant

2

Levett that Mr. Partridge was psychotic. *Id.* ¶ 22. Mr. Partridge then told mental health workers at the jail that he had suicidal thoughts. *Id.* ¶ 25. Jail mental health workers described Mr. Partridge as unstable and worried about his "ability to keep himself safe." *Id.* Mr. Partridge was then prescribed anti-psychotic medication. *Id.* On March 9, 2016, a Boulder County Court judge overseeing Mr. Partridge's misdemeanor case ordered him to the state mental hospital. *Id.* ¶ 26.

Less than a month later, on March 22, 2016, deputies saw Mr. Partridge attempting to gouge out his eyes. *Id.* ¶ 28. In response to this self-harming behavior, deputies put Mr. Partridge in a restraint chair, and though he had been compliant, they put a "spit sock" on his head. *Id.* Mr. Partridge then began to spit, and Defendant Mitchell tased Mr. Partridge while he was restrained in the restraint chair. *Id.*

After attempting to gouge out his eyes for the second time at the Boulder County Jail, Mr. Partridge's mental health crisis deepened. A mental health worker filed an Emergency Mental Illness Report and Application, stating that Mr. Partridge was "currently presenting with psychotic symptoms, recently attempted suicide by gouging eyes out and is a danger to himself and in need of in-patient treatment." *Id.* ¶ 29. On March 28, 2016, a Boulder District Court Judge ordered Mr. Partridge to be civilly committed after finding that he was mentally ill and a danger to himself, others, or was gravely disabled. *Id.* ¶ 30. That same day, the Boulder County Jail transported Mr. Partridge to the emergency room at Boulder Community Hospital. *Id.* ¶ 31.

On March 29, 2016, Mr. Partridge was forcing himself to vomit at the jail. *Id.* ¶ 32. He told deputies that his food was being poisoned by the jail and that he was hearing voices. *Id.* A mental health worker saw Mr. Partridge making himself vomit and heard

3

him make psychotic statements. *Id.* Multiple deputies put on full riot gear and pinned Mr. Partridge against the wall. *Id.* The deputies then placed Mr. Partridge in a restraint chair without incident. *Id.*

On September 15, 2016, Mr. Partridge informed jail staff that he had been diagnosed with schizophrenia, and he asked to see mental health. *Id.* ¶ 36. When he met with a counselor the next day, Mr. Partridge spoke in an Irish accent and told her that the judge could hear his thoughts, that he wanted to make his mother his puppet, and that he was experiencing delusions. *Id.* ¶ 37. On the same day, his attorney raised concerns about Mr. Partridge's competency, and Mr. Partridge screamed that he was "not crazy," in the court and in the holding cell at the courthouse. *Id.* Boulder County deputies witnessed his behavior and noted it in his jail records. *Id.* During this time period, a mental health worker at the jail noted that Mr. Partridge had a previous psychotic episode at the jail, was diagnosed as schizophrenic, was not taking medications, and could begin to decompensate. *Id.* ¶ 39. During this period, mental health workers at the jail observed that Mr. Partridge was in a manic phase and had not been sleeping. *Id.* ¶ 42.

On October 30, 2016, jail employees noted that Mr. Partridge was behaving erratically and that he was delusional and detached from reality. *Id.* ¶ 43. Mr. Partridge told a jail officer that he was scared that the officer was going to starve him to death or kill him. *Id.* Multiple deputies witnessed this behavior, and he was moved to a disciplinary module. *Id.* Jail records noted Mr. Partridge's "[d]elusional behavior." *Id.*

On November 1, 2016, Mr. Partridge spent the day pacing the room and talking to himself, and the defendants knew him to be schizophrenic, delusional, untreated, and

4

suicidal. *Id.* ¶ 45. Despite this knowledge, Boulder County jail staff allowed Mr. Partridge to walk on the second tier of the jail. *Id.* Mr. Partridge attempted suicide by jumping headfirst off of the second-floor railing. *Id.* He suffered fractures to his lumbar spine and ribs. *Id.* At least one Boulder County jail employee began referring to Mr. Partridge as "Parachute Partridge" after his suicide attempt. *Id.*

Mental health workers examined Mr. Partridge in the days after his suicide attempt and noted that he was suffering delusions, paranoia, and auditory hallucinations. *Id.* ¶¶ 47-48. Despite these facts, Boulder County jail staff cleared him from special housing just over a week after his suicide attempt. *Id.* ¶ 49. On December 3, 2016, jail mental health staff noted their concern that Mr. Partridge was "going to decompensate quickly," particularly because his "history is that he can mentally go downhill quickly and become in a severe mental state." *Id.* ¶ 55. On December 6, 2016, Defendant McGurk attended a court hearing and requested the court send Mr. Partridge to the Colorado Mental Health Institute at Pueblo ("CMHIP") and that he be "bumped to the top of the list for his safety and staff safety." *Id.* ¶ 56. Mr. Partridge's parents again contacted the jail to express concern about his mistreatment, as well as their fear that he would "die in the jail." *Id.* ¶ 58.

Throughout the first weeks of December, Mr. Partridge regularly refused to put on clothes, leave his cell, or respond to jail staff verbally or non-verbally. *Id.* ¶ 59. He vacillated between days without sleep and days during which all he did was sleep. *Id.* On December 16, 2016, jail staff faxed an affidavit to the Boulder County Attorney detailing Mr. Partridge's urgent need for psychiatric treatment. *Id.* ¶ 61. Jail staff stated that he believed Mr. Partridge's "condition has deteriorated and will continue to

5

deteriorate," and that Mr. Partridge "is a danger to himself and/or others." *Id.* A Boulder District Court Judge then signed an order for a mental health evaluation of Mr. Partridge after finding probable cause that he was "mentally ill, and as a result of such mental illness, is an imminent danger to himself or others." *Id.* The District Court Judge ordered that the Boulder County Sheriff's Office transport Mr. Partridge to CMHIP for emergency evaluation and treatment. *Id.* ¶¶ 62-63.

Mr. Partridge was not taken to CMHIP. *Id.* ¶ 65. Nearly a day after the emergency order to take Mr. Partridge to CMHIP, on the afternoon of December 17, his parents contacted the Boulder County Jail and begged the jail to send him to CMHIP or to make him take his medication. *Id.* ¶ 66. Though a note was put in Mr. Partridge's record to have a "prescribing physician" see him, no visit ever happened. *Id.* ¶¶ 67-68.

Defendant Boulder County Sheriff's Office has established an established practice of not requesting or providing involuntary medication or sending mentally ill inmates to hospitals where they can be treated properly. *Id.* ¶ 88. Moreover, the Defendant supervisors have a practice of not ensuring sufficient monitoring of seriously mentally ill inmates, including those who are going untreated in the jail. *Id.* Boulder County Jail officials have repeatedly, publicly admitted that they struggle with mentally ill inmates, have a lack of funding to deal with them, and have been understaffed with mental health workers capable of caring for mentally ill inmates. *Id.* ¶¶ 90-91. Indeed, a 2016 independent report on the jail found inadequate mental health services for inmates, understaffing of mental health workers, and a chronic refusal to treat inmates with mental health issues. *Id.* ¶ 92.

Rather than treat or accommodate his mental illness, multiple individual Defendants repeatedly engaged in excessive force against Mr. Partridge. On March 3, 2016, while Mr. Partridge was in the midst of an obvious, untreated mental health crisis, Defendant Hollonds punched him in the face immediately after Mr. Partridge slipped out of his cell. *Id.* ¶ 24. After Defendant Hollonds had wrestled Mr. Partridge to the floor, he continued punching Mr. Partridge in the head. *Id.* While being moved to a disciplinary cell after this incident, Mr. Partridge stopped walking. *Id.* Deputies immediately pinned Mr. Partridge against the door, and while Mr. Partridge was pinned, Defendant Groff tased Mr. Partridge. *Id.*

On March 22, 2016, at around 1 a.m., deputies escorted Mr. Partridge out of his cell so that it could be cleaned. *Id.*¶ 27. Upon returning to the cell, Mr. Partridge stuck his hand in the door so that it would not close. *Id.* Defendant Maumau punched Mr. Partridge in the chest and told him to move his hand. *Id.* Mr. Partridge did not do so, and Defendant Maumau tased his fingers. *Id.* Later that day, Defendant Mitchell tased Mr. Partridge while he was restrained in a restraint chair, after Mr. Partridge again attempted to gouge out his eyes. *Id.* ¶ 28.

Less than a month after Mr. Partridge attempted suicide, Mr. Partridge's attorney came to visit him. *Id.* ¶ 53. While suffering severe paranoia and delusions (including that the deputies were trying to kill him), Mr. Partridge allegedly swung at a deputy. *Id.* Defendants Hicks and Newcomb punched Mr. Partridge in the face. *Id.* When Mr. Partridge was on the ground and surrounded by multiple deputies, Defendant Hicks continued to punch Mr. Partridge. *Id.* While Mr. Partridge was on the ground being punched by deputies, Defendants Groff and Koger each tased him. *Id.*

The excessive force continued less than a week later when Defendant Sisneros punched Mr. Partridge and Defendant Groff tased him, in response to Mr. Partridge's failure to comply with their handcuffing him. *Id.* ¶ 57. Just over a week after this incident, Mr. Partridge suffered punches and a tasing at the hands of Defendants Clem and Koger. *Id.* ¶ 60. The officers went into Mr. Partridge's cell to provoke him, and they yanked his blanket off of his naked body. *Id.* Mr. Partridge jumped up, screamed nonsense, and moved toward the door, at which point Defendant Clem punched Mr. Partridge, and Defendant Koger tased Mr. Partridge (for the third time in two weeks). *Id.*

Finally, on the night of December 17, 2016, after Mr. Partridge had blinded himself and was covered in blood, Defendant Smith slammed Mr. Partridge to the ground and Defendant Maumau tased him, claiming that Mr. Partridge—blind and covered in blood—did not comply with their attempt to handcuff him. *Id.* ¶ 72.

## III. **Standard of Review**

The Federal Rules of Civil Procedure allow motions to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Motions for judgment on the pleadings under Rule 12(c) are analyzed according to the same standards as a motion under Rule 12(b)(6). *See, e.g., Park University Enterprises, Inc. v. American Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

"There is a strong presumption *against* the dismissal of claims under" Rule 12(b)(6). *Blevins v. Reid*, 2008 U.S. Dist. LEXIS 46168, at *9 (D. Colo. June 12, 2008) (citing *Cottrell, Ltd. v. Biotrol Intern., Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999)) (emphasis added). When a defendant files a Rule 12(b)(6) motion to dismiss, a court must accept as true "all well-pleaded factual allegations in a complaint and view these

8

allegations in the light most favorable to the plaintiff." *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011) (citation omitted). Generally, a complaint will survive a Rule 12(b)(6) motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausible" does not mean "likely to be true," but is, instead, a nudge beyond "conceivable." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*; *see also Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

## IV. Argument

The ADA "commands that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1772 (2015) (quoting 42 U. S. C. § 12132). "To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Hughes v. Colo. Dep't of Corr.*, 594 F. Supp. 2d 1226, 1239 (D. Colo. 2009).[1]

Individuals who are mentally disabled are entitled to reasonable accommodations during detention or incarceration under the ADA. *Robertson v. Las Animas Cty. Sheriff's*

---

[1] Courts generally apply the same analysis to claims of discrimination under both the Rehabilitation Act and Title II of the ADA because language in both is substantially the same. *See, e.g., Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 726 (10th Cir. 2011).

9

*Dep't*, 500 F.3d 1185, 1194-95 (10th Cir. 2007). This means that jails are required to provide "meaningful" access to their programs and services for disabled detainees. *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1214 (D. Colo. 2010).

Plaintiff's Complaint adequately alleges that, in repeatedly using excessive force against Mr. Partridge, Defendants did not take steps to reasonably accommodate his disabilities. The Ninth Circuit's decision in *Sheehan* is instructive and illustrates that Plaintiff's Complaint properly pleads a violation of Title II of the ADA. In *Sheehan*, the police were called to a group home where the plaintiff, who suffered from mental illness, lived because the plaintiff had violently threatened her social worker. *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1215 (9th Cir. 2014) (reversed on other grounds). When officers arrived, the plaintiff grabbed a knife, threatened the officers with it, and retreated into her room in the group home and closed the door. *Id.* The officers, rather than taking actions to de-escalate the situation, forced their way into the plaintiff's room (even though the plaintiff had no means of escape). *Id.* at 1215-16. The plaintiff again threatened the officers with a knife and they shot her six times. *Id.* at 1216. The Ninth Circuit found that the above actions formed the basis for a claim for violation of the ADA. *Id.* at 1231-1233. The Court found that the city, through the actions of its police officers, could be determined to have failed to reasonably accommodate the plaintiff's disabilities. *Id.* at 1233. Likewise, Mr. Partridge adequately asserts that the deputies failed to reasonably accommodate his disability by failing to "employ[] tactics that would have been less likely to resolve the situation without injury to [Mr. Partridge] or others." *Id.*; *see Complaint*, ¶¶ 24, 27-28, 32, 53, 57, 60, 72-74, 86. Mr. Partridge adequately alleges in his complaint that Boulder County failed to provide a reasonable

accommodation and subjected him to greater harm than other detainees when Defendants failed to "respect[] [Mr. Partridge's] comfort zone, engage[] in non-threatening communications, and use[] the passage of time to defuse the situation rather than precipitating" a confrontation. *Sheehan*, 743 F.3d at 1233.

Defendant Deputies took no actions to defuse situations with Mr. Partridge and, instead, escalated situations by provoking him and resorting to force immediately when he did simple, harmless things like stop walking, even while it was obvious he was suffering from the effects of his severe mental disabilities. *See Complaint*, ¶¶ 24, 27-28, 32, 53, 57, 60, 72-74, 86. To claim that Mr. Partridge was non-compliant and therefore Boulder County's employees did not fail to accommodate his mental illness, *see Def's Mot.* at 11-12, does not do justice to what Mr. Partridge has alleged and certainly does not view those allegations in the light most favorable to him as is required at this stage. *See Complaint*, ¶¶ 24, 27-28, 32, 53, 57, 60, 72-74, 86.

To the extent that Defendant argues that no actions were taken "by reason of" Mr. Partridge's disability, Defendant overstates the analysis. Courts have noted that:

> [T]he question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she. Rather, intentional discrimination is shown by an intentional, or willful, violation of the Act itself. With this understood, it becomes clear, that while defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from plaintiff the reasonable accommodations to which she was entitled under the law. They had notice of the potential risk of their decision, and clearly refused the accommodation knowingly.

*Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998); *see also id.* (stating that deliberate indifference standard for failure to provide reasonable

11

accommodations requires that defendants "had notice of the potential risk of their decision, and clearly refused the accommodation knowingly.").

Boulder Sheriff's Office Defendants knew of Mr. Partridge's severe mental illness and knew how it manifested. With this knowledge, they repeatedly provoked him and immediately resorted to force against him, while he was suffering obvious mental health crises. Fundamentally, the cases Defendant cites do not deal with the amount of force necessary in an ADA context, and instead deal with whether the person seeking an accommodation had committed certain crimes or offenses to be arrested. *See Def's Mot.* at 12. To the extent *Smith v. City of Troy*, 874 F.3d 938 (6th Cir. 2017), does address excessive force alongside ADA claims, the arresting officer defendants did not know of the plaintiff's disability (epilepsy) and so did not engage in uses of force with the knowledge of that disability. *Id.* at 942-947; *see also Gohier v. Enright*, 186 F.3d 1216, 1217-1222 (10th Cir. 1999) (officer who used for was not aware of suspect's disability). In this case, the individual Defendants clearly knew of Mr. Partridge's severe mental illness when they decided both to use force against him and what amount of force to use. Rather than accommodate his obvious mental illness, Plaintiff's allegations indicate that individual Defendants immediately escalated force, when Mr. Partridge behaved strangely.

Moreover, Plaintiff states a claim under the ADA for Defendant Boulder Sheriff's Office's failure to properly train its officers on how to deal with severely mentally ill detainees, like Mr. Partridge. *See, e.g.*, Complaint ¶¶ 87-92, 204-09. Specifically, Mr. Partridge alleged that Defendant fails "to properly train, supervise and/or discipline its employees regarding the proper treatment of, and accommodations for, individuals with

12

. . . mental disabilities." *Id.* ¶ 204. Mr. Partridge stressed that "the need for specialized training, supervision and discipline regarding such decisions is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in" violations of detainees rights that Defendant is liable. *Id.* ¶ 206.

Mr. Partridge was qualified to receive the benefit of deputies properly trained to interact with members of the community with mental health disabilities, Defendant Boulder County denied him the benefit of that proper training, and that denial proximately caused his the repeated excessive force he suffered.

> Such a failure to train can constitute a violation of the ADA, which requires owners of public accommodations, with limited exceptions not applicable here, "to take such steps as may be necessary to *ensure* that no individual with a disability is excluded, denied services, segregated or *otherwise treated differently* than other individuals because of the absence of auxiliary aids and services."

*Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2d Cir. 2008) (quoting 42 U.S.C. § 12182(b)(2)(A)(iii)) (emphasis in original); *see also Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 127 (N.D.N.Y. 2000) ("[U]nder the ADA, [d]efendants can and must ensure that they adopt the proper policies and procedures to train their employees on dealing with disabled individuals and make reasonable efforts to ensure that those policies and procedures are properly carried out and enforced."); *Estate of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 424 (D. Md. 2014); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D. Pa. 2003).[2]

---

[2] The Tenth Circuit "has not recognized a failure-to-train claim of discrimination under the ADA, **but [has also] not foreclosed the possibility**." *J. V. ex rel. C. V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1297 (10th Cir. 2016) (emphasis added); s*ee also Sperry v. Maes*, 592 F. App'x 688, 698 (10th Cir. 2014) ("[W]e do not have to determine whether such a [failure-to-train ADA] claim exists."), *cert. denied*, 136 S. Ct. 44 (2015).

In a similar case, Judge Daniel refused to dismiss ADA claims against the City of

Lone Tree for failure to train. The court ultimately allowed the plaintiff to

> go forward with its ADA claim based on his allegations that Lone Tree
> should have adopted polices to accommodate disabled individuals such
> as Plaintiff, and should have properly trained its officers to recognize and
> reasonably accommodate individuals exhibiting signs of 'excited delirium,'
> mental illness or disability.

*Buben v. City of Lone Tree*, 2010 U.S. Dist. LEXIS 104853, at *32-33 (D. Colo. Sep. 30,

2010). This determination was fully consistent with the result in *Schorr*:

> The *Hainze* rationale for disallowing ADA claims when the challenged
> conduct occurred during 'exigent circumstances' does not apply here . . .
> Plaintiffs have not brought this action against any of the officers involved .
> . . and any exigent circumstances at the time of arrest are therefore
> irrelevant. Rather, Plaintiffs have brought their ADA claim against the
> Commission for failing to properly train those officers, resulting in the
> death of [Plaintiff]. The alleged non-compliance with the training
> requirements of the ADA did not occur the day that the officers shot
> [Plaintiff]; it occurred well before that day, when the Defendant
> policymakers failed to institute policies to accommodate disabled
> individuals such as [Plaintiff[ by giving the officers the tools and resources
> to handle the situation peacefully.

*Schorr*, 243 F.Supp.2d at 238. Mr. Partridge has plausibly alleged that Boulder County

Sheriff's Office refused to accommodate his severe mental illness in repeatedly

provoking and using excessive force against him, while he was suffering mental health

crises, and that they violated his ADA rights by refusing to train and supervise their

employees with respect to the treatment of severely mentally ill detainees.

For the reasons outlined above Defendants' motion should be denied.

Respectfully submitted this 18th day of June 2019.

KILLMER, LANE & NEWMAN, LLP

s/ Reid A. Allison
David A. Lane

14

Reid Allison
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 facsimile
dlane@kln-law.com
rallison@kln-law.com

and

Kathryn Stimson
HADDON MORGAN FOREMAN, LLP
150 E 10th Avenue
Denver, CO  80203
303-831-7364
kstimson@hmflaw.com

*Counsel for Plaintiff Ryan Partridge*

## CERTIFICATE OF SERVICE

I certify that on this 18th day of June 2019, I filed this **RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [# 119]** via CM/ECF, and CM/ECF will generate a Notice of Electronic Filing to the following:

Trina Ruhland
Dea Wheeler
Kari Goodnight
David Hughes
Boulder County Attorney's Office
P.O. Box 471
Boulder, CO 80301
truland@bouldercounty.org
dwheeler@bouldercounty.org
kgoodnight@bouldercounty.org
dhughes@bouldercounty.org

*s/ Charlotte Bocquin Scull*
Paralegal

16