**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 17-cv-02941-CMA-STV

RYAN PARTRIDGE,

     Plaintiff,

v.

T. SMITH, in his individual and official capacity;
KARMEN KOGER, in her individual and official capacity;
THOMAS GROFF, in his individual and official capacity;
ROBERT HICKS, in his individual and official capacity;
DAN NEWCOMB, in his individual and official capacity;
CHUCK SISNEROS, in his individual and official capacity;
GREGORY CLEM, in his individual and official capacity;
VILI MAUMAU, in his individual and official capacity;
ANTHONY HOLLONDS, in his individual and official capacity;
LYDIA MITCHELL, in her individual and official capacity;
BOULDER COUNTY SHERIFF'S OFFICE,

     Defendants.

---

**ORDER ADOPTING THE DECEMBER 3, 2019 RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE ON DEFENDANT BOULDER COUNTY SHERIFF'S
OFFICE'S MOTION FOR JUDGMENT ON THE PLEADINGS**

---

This matter is before the Court on the December 3, 2019 Recommendation of

United States Magistrate Judge ("the Recommendation") (Doc. # 145), wherein

Magistrate Judge Scott T. Varholak recommends that the Court deny Defendant

Boulder County Sheriff's Office's ("Sheriff's Office") Motion for Judgment on the

Pleadings (Doc. # 119) and allow Plaintiff's Americans with Disability Act ("ADA") and

Rehabilitation Act claims to proceed against it. The Sheriff's Office timely objected to the

Recommendation. (Doc. # 146.) For the reasons described herein, the Court affirms and adopts the Recommendation and grants in part and denies in part the Sheriff's Office's Motion for Judgment on the Pleadings.

## I.     BACKGROUND

The Magistrate Judge's Recommendation provides a recitation of the factual and procedural background of this dispute and is incorporated herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Accordingly, this Order will reiterate only what is necessary to address the Sheriff's Office's objections.

## A.     FACTUAL BACKGROUND

Plaintiff, Mr. Ryan Partridge, has been diagnosed with schizophrenia, which manifests in "psychosis, auditory and visual hallucinations, delusions, and paranoia." (Doc. # 1 at 5.) In 2015 and 2016, Mr. Partridge was arrested on various minor charges and went to the Boulder County Jail after each arrest. (*Id*. at 6.) The instant case stems from events that took place between 2015 and 2016 at the Boulder County Jail, which culminated in Mr. Partridge gouging his eyes out by hand in his jail cell.

### 1.     Allegations Related to Defendant's Awareness of Mr. Partridge's Mental Illness

Mr. Partridge alleges that Defendant was well aware of Mr. Partridge's serious mental illness and deteriorating mental condition. Mr. Partridge engaged in several behaviors that indicated he was suffering from delusions, psychosis, and paranoia during his time at the Boulder County Jail. "In early 2016, Mr. Partridge reported to deputies that the CIA was telling him to 'dig out his eyes,'" and Mr. Partridge attempted to do so. (Doc. # 1 at 6.) On March 29, 2016, Mr. Partridge stated that he was forcing

2

himself to vomit because "his food was being poisoned by the jail, he was hearing voices in his head and [] the phone calls were bothering him." (*Id*. at 9.) On September 15, 2016, Mr. Partridge reported that he had been diagnosed with schizophrenia and requested a meeting with mental health. (*Id*. at 10.) On September 16, 2016, Mr. Partridge told a mental health worker, in an Irish accent, that "he knew the judge could hear his thoughts" and "he wanted to make his mother a puppet." (*Id*. at 10.) On the same day, Mr. Partridge screamed in court that he was "not crazy" and screamed the same while pacing back and forth in the court's holding cell. (*Id*.) When one deputy asked Mr. Partridge whether he wanted juice, Mr. Partridge responded: "You're trying to make it look like I killed my family, aren't you?" (*Id*. at 12.) When another deputy responded to a report that Mr. Partridge was acting 'inappropriately' in his cell, Mr. Partridge asked the deputy if he was there to kill him. (*Id*. at 7.) On December 1, 2016, Mr. Partridge "roared like an animal" at a deputy. (*Id*. at 13.) Throughout the early weeks of December, Mr. Partridge regularly refused to put on clothes, leave his cell, speak, or respond. (*Id*. at 15.)

Additionally, Mr. Partridge engaged in several acts of self-harm of which jail staff was aware. Mr. Partridge tried to remove his own eyes on at least two occasions and succeeded on his third attempt. (*Id*. at 20.) Mr. Partridge attempted suicide on two occasions, once by jumping off a second-floor railing. Mr. Partridge intentionally banged his head into the toilet in his cell, breaking several of his own teeth. (*Id*. at 6–7.)

Deputies and mental health workers at the jail took note of Mr. Partridge's declining mental health on many instances:

- In February 2016, deputies noted that Mr. Partridge "was more mentally ill than he had been previously." (*Id*. at 6.)

- "Deputies and mental health staff noted Mr. Partridge had been on psychiatric mediations in the past, was not currently on medications, was presenting with psychosis and [was] acting bizarrely." (*Id*.)

- On February 25, 2016, a deputy reported Mr. Partridge was psychotic and should be on "house alone" status. (*Id*. at 7.)

- On March 7, 2016, Mr. Partridge told a mental health worker that he had suicidal thoughts, and she described Mr. Partridge as "unstable" and "thought blocking." (*Id*.)

- On March 21, 2016, a deputy wrote: "Inmate Partridge is well known to the Boulder County Jail staff and has a history of mental health issues, which has been deteriorating significantly, with each passing incarceration." (*Id*. at 6.)

- On March 22, 2016, a mental health worker reported that Mr. Partridge was presenting with auditory and visual hallucinations. She described Mr. Partridge as "currently presenting with psychotic symptoms" and noted that he "recently attempted suicide by gouging eyes out and is a danger to himself and in need of in-patient treatment." (*Id*. at 9.) A nurse reported Mr. Partridge as "psychotic" and "chanting." (*Id*.)

- On November 7, 2016, a mental health counselor noted that Mr. Partridge reported that "he was experiencing auditory hallucinations and that being isolated added to his neurosis." (*Id*. at 13.)

- On November 2, 2016, a mental health worker reported that Mr. Partridge was suffering from delusions and paranoia. (*Id*. at 12.)

- On December 3, 2016, a mental health counselor noted concern that "[Mr. Partridge] is going to decompensate quickly . . . . [His] history is that he can mentally go downhill quickly and become in a severe mental state." (*Id*. at 14.)

- On December 16, 2016, Defendant Shane McGurk stated in an affidavit: "I have become increasingly concerned with the behavior of Ryan Partridge. I believe that Inmate Partridge's condition has deteriorated and will continue to deteriorate." (*Id*. at 16.)

2.    <u>Allegations Related to Defendant's Uses of Force and Solitary Confinement Against Mr. Partridge</u>

In March 2016, Mr. Partridge was placed in the Disciplinary, Special Management and Maximum Module at the jail because of his psychotic behavior. (*Id*. at 7.) On March 3, 2016, en route to a disciplinary cell, "Mr. Partridge planted his feet and refused to keep walking. Deputies pinned Mr. Partridge against the door and ordered him to stop resisting. Defendant Sergeant Groff then tased him, using the drive-stun feature of the Taser." (*Id*. at 7.)

On March 22, 2016, as several deputies were escorting Mr. Partridge back to his cell after his cell was cleaned:

> Mr. Partridge stuck his hands and arms in the door so the cell door would not close. Defendant [D]eputy Mau[m]au punched him in the chest and told him to move back so the door could close. Mr. Partridge, non-compliant, kept holding onto the door with his hands. Defendant Deputy Mau[m]au told Mr. Partridge he would tase him if he did not comply and then used his Taser to drive-stun Mr. Partridge's fingers so he would remove them from the door.

(*Id*. at 8.)

Also on March 22, 2016, upon seeing that Mr. Partridge was attempting to gouge his eyes out, Deputies Nelson and Vaughan opened Mr. Partridge's cell door to put him in a restraint chair. (*Id*. at 8.) Mr. Partridge was complaint as the deputies restrained his arms and legs. Despite his compliance and "even though Mr. Partridge had not been spitting on anyone, deputies placed a 'spit sock' over his head. Then, Mr. Partridge began to spit at the deputies through the 'spit sock.' Sergeant Mitchell tased Mr. Partridge." (*Id*.)

On March 29, 2016, Mr. Partridge forced himself to vomit in his cell. Mr. Partridge alleges:

> Deputies asked him why he was forcing himself to vomit and he stated his food was being poisoned by the jail, he was hearing voices in his head and that the phone calls were bothering him. Deputies called mental health personnel. Mental health worker Defendant Mergen Mittleider saw Mr. Partridge making himself vomit and heard Mr. Partridge make psychotic statements. Ms. Mittleider advised deputies that the solution was to place Mr. Partridge in a restraint chair. Defendant Deputies Biggs, Vaughan, Mecca, Anderson, Sanchez and Sergeant Knight put on full riot gear. Deputy Anderson first entered Mr. Partridge's cell, held his shield out in front of him and pinned Mr. Partridge against the wall while yelling "Get down!" Mr. Partridge was placed into the restraint chair and a "spit sock" forced over his head without incident.

(*Id*. at 9.)

On December 2, 2016, Mr. Partridge's attorney attempted to visit him. Mr. Partridge alleges:

> Deputies claim Mr. Partridge was not following protocol to go visit his attorney. Mr. Partridge, while paranoid, delusional, and concerned that deputies were trying to kill him when one of them went to place restraints on him, Mr. Partridge allegedly swung at the deputy. Defendant Deputy Hicks and Defendant Deputy Newcomb punched Mr. Partridge in the face. Other deputies punched Mr. Partridge as well. Once he fell to the ground,

Defendant Deputy Hicks continued to pummel Mr. Partridge in the back with "hammer-fist blows" four to five times. Defendant Sgts. Groff and Koger both tased Mr. Partridge. After the incident, Mr. Partridge was covered in blood. He was bleeding from his head, nose and mouth.

(*Id*. at 14.)

On December 8, 2016, Mr. Partridge's parents attempted to visit him. Mr.

Partridge alleges:

Defendant Deputies Sisneros, Palmer, Ubias, Gerhart and Sgt. Koger and Sgt. Groff planned to handcuff and restrain Mr. Partridge for his visit. Mr. Partridge again did not appropriately follow orders and pulled one arm through the food port so only one arm was handcuffed. In response, Defendant Deputy Sisneros punched Mr. Partridge and Defendant Sgt. Koger again tased Mr. Partridge.

(*Id*. at 15.)

Mr. Partridge alleges that on December 16, 2016:

[He] was laying naked with a blanket covering him like he had been doing for several days. Defendant Deputy Gregory Clem together with Defendants Sgts. Koger and Groff and other deputies planned to "see if [they] could get him to move." The officers opened Mr. Partridge's cell door, and Defendant Sgt. Groff pulled the blanket off of Mr. Partridge's body. In response, Mr. Partridge jumped up, screamed "nonsense" and "rushed toward" the door. Defendant Deputy Clem punched Mr. Partridge in the chest and Defendant Sgt. Koger tased Mr. Partridge. This was the third time in less than two weeks that Defendant Sgt. Koger tased Mr. Partridge either in his cell or at the door of his cell. In all three instances, Mr. Partridge was alone in his cell, posing no threat whatsoever to the officers. Indeed, he was severely mentally ill and suffering from a delusion that officers were going to hurt him or kill him.

(*Id*. at 16.)

On December 17, 2016, Mr. Partridge gouged his eyes out with his own hands.

Deputies noted that Mr. Partridge's eyes were swollen and bleeding and Mr. Partridge

had blood on his hands. Mr. Partridge alleges:

At this point, Mr. Partridge's eyes were swollen shut. He could not see. He had blood on his hands. According to officers, Mr. Partridge was not compliant when they attempted to place handcuffs on him. Even though he was covered in blood, with eyes swollen shut and blind, Deputy Smith slammed Mr. Partridge to the ground. Defendant Sgt. Maumau tased him.

(*Id*. at 18.)

### 3. Allegations Related to Defendant's Failure to Train

Plaintiff alleges that Defendant Boulder County Sheriff's Office "failed (and continues to fail) to properly train, supervise and/or discipline its employees regarding the proper treatment of, and accommodations for, individuals with disabilities and, in particular, mental disabilities." (*Id*. at 39.) Plaintiff further claims that "Defendant supervisory personnel at [the Boulder County Jail] have public[ly] admitted they cannot handle mentally ill inmates," including Sergeant Lydia Mitchell's statement that "We're deputies, not mental health specialists. Some of the hardest decisions we make currently are in housing our mental health population . . . ." *See* (*id*. at 22–23).

## B. PROCEDURAL HISTORY

On December 7, 2017, Plaintiff initiated the instant action against 22 individuals, including Boulder County Sheriff's Office deputies, division chiefs, and the Sheriff himself. *See generally* (Doc. # 1). Plaintiff asserted thirteen claims. In its March 5, 2019 Order, this Court affirmed and adopted in part and rejected in part the September 18, 2018 Recommendation of Magistrate Judge Varholak (Doc. # 88) and dismissed Claims One, Five, Ten, and Thirteen. *See generally* (Doc. # 108). Counsel for the individual and official capacity defendants agreed at the April 5, 2019 scheduling conference to treat the Sheriff's Office as the defendant against whom Mr. Partridge's ADA and Rehabilitation Act claims are asserted.

Mr. Partridge alleges ADA and Rehabilitation Act claims against the Sheriff's Office under three theories. Magistrate Judge Varholak summarized these theories as follows:

> The Court reads the Complaint as alleging a failure to accommodate claim under the ADA and the Rehabilitation Act, premised on the following conduct: (1) inadequate medical treatment; (2) jail staff's allegedly inappropriate interactions with Plaintiff, including the use of excessive force and exacerbation of his condition through placement in solitary confinement; and (3) Defendant's failure to train its staff on how to recognize and accommodate inmates with mental health conditions.

(Doc. # 145 at 10) (citing Doc. # 1).

On May 14, 2019, the Sheriff's Office filed the instant Motion, which argues that Mr. Partridge fails to state a claim under the ADA and the Rehabilitation Act on two grounds: (1) Mr. Partridge fails to state a claim for failure to accommodate because he has not identified a request for accommodation and he bases his claim on allegedly inadequate medical care, and (2) Mr. Partridge fails to state a claim for discriminatory use of force. *See generally* (Doc. # 119). The Sheriff's Office does not dispute in its Motion that Mr. Partridge has sufficiently alleged he is a qualified individual with a disability. (Doc. # 119 at 8 n.4.) Plaintiff responded to Defendant's Motion (Doc. # 127), and Defendant replied (Doc. # 128).

Magistrate Judge Varholak issued his Recommendation on the Sheriff's Office's Motion on December 3, 2019. (Doc. # 145.) Magistrate Judge Varholak began his analysis with the Sheriff's Office's argument that Mr. Partridge has failed to identify any request for an accommodation under the ADA. Magistrate Judge Varholak rejected this argument, finding that Mr. Partridge's need for accommodation was obvious, which rendered an explicit request for accommodation unnecessary. (Doc. # 145 at 12.) Next,

Magistrate Judge Varholak analyzed whether Mr. Partridge has plausibly alleged that the Sheriff's Office failed to provide him a reasonable accommodation under three theories—i.e., inadequate medical treatment, jail personnel's interactions with Mr. Partridge, including excessive use of force and solitary confinement, and failure to train. (*Id*. at 14–26.) He concluded that Mr. Partridge's ADA and Rehabilitation Act claims fail only to the extent they rely on inadequate medical treatment and ultimately recommended that both claims be allowed to proceed under Mr. Partridge's remaining theories. (*Id*. at 26.)

The Sheriff's Office filed its Objection to December 3, 2019 Recommendation of Magistrate Judge on December 17, 2019, wherein it objects to Magistrate Judge Varholak's recommendations that Plaintiff's ADA and Rehabilitation Act claims proceed on the theories of failure to reasonably accommodate through use of force and failure to train. (Doc. # 146.) Mr. Partridge responded to the Sheriff's Office's objection on January 9, 2020. (Doc. # 152.) He did not file an objection of his own.

## II.   <u>LEGAL STANDARDS</u>

### A.   REVIEW OF A RECOMMENDATION

When a magistrate judge issues a recommendation on a dispositive matter, Fed. R. Civ. P. 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." An objection is properly made if it is both timely and specific. *United States v. One Parcel of Real Property Known As 2121 East 30th Street*, 73 F.3d 1057, 1059 (10th Cir. 1996). In conducting its review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the

magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In the absence of a timely objection, however, "the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings.")).

## B.    MOTION FOR JUDGMENT ON THE PLEADINGS

"A motion for judgment on the pleadings under [Fed. R. Civ. P.] 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000). Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Accordingly, dismissal is appropriate under Fed. R. Civ. P. 12(c) if the plaintiff's complaint fails to state a claim upon which relief can be granted.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility in this context means that the plaintiff pled factual content which allows "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The plausibility standard is not a probability requirement, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall*,

935 F.2d at 1198. However, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## C.    AMERICANS WITH DISABILITY ACT AND REHABILITATION ACT

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B); *United States v. Georgia*, 546 U.S. 151, 154 (2006). The ADA applies to state prisons, which qualify as public entities for the purposes of the ADA. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

Because "[t]he Rehabilitation Act is materially identical to and the model for the ADA," the elements of claims asserted under the statutes are the same, except that the Rehabilitation Act requires that the defendant receives federal funds. *Tivis v. Dowis*, No. 11-CV-02050-PAB-KMT, 2014 WL 4413216, at *6 (D. Colo. Sept. 8, 2014) (quoting *Crawford v. Ind. Dept. of Corrs.*, 115 F.3d 481, 483 (7th Cir. 1997), *abrogated on other grounds as recognized in Erickson v. Board of Govs.*, 207 F.3d 945, 948 (7th Cir. 2000)); *compare PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled

individuals.") *with Arbogast v. Kan., Dep't of Labor*, 789 F.3d 1174, 1182 (10th Cir. 2015) ("Congress enacted the Rehabilitation Act of 1973 to combat discrimination targeted toward individuals with physical and mental disabilities.").

"Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch.,* 813 F.3d 1289, 1295 (10th Cir. 2016). Department of Justice regulations "require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'" *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (quoting 28 C.F.R. § 35.130(b)(7)). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *J.V.*, 813 F.3d at 1299 (quoting *Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.")).

An underlying Title II violation is necessary to maintain a failure to train claim under the ADA. *Trujillo v. Rio Arriba Cty. ex rel. Rio Arriba Cty. Sheriff's Dep't*, 319 F.R.D. 571, 617 (D.N.M. 2016) (citing *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 177 n. 3 (4th Cir. 2009) ("[I]t is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie.") (quoting *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).

## III.    DISCUSSION

## A.    REQUEST FOR ACCOMMODATION

### 1.    Magistrate Judge's Analysis

In its Motion for Judgment on the Pleadings, the Sheriff's Office argues that Mr. Partridge's reasonable accommodation claim fails for failure to identify "any request for accommodation, the nature of any accommodation requested, how much accommodation would have allowed full access to its services, or how the Sheriff's Office allegedly became aware of a need for accommodation." (Doc. # 119 at 10) (footnote omitted). Magistrate Judge Varholak listed numerous alleged instances in which Mr. Partridge's mental health issues manifested in his interactions with jail staff and in which jail staff noted his mental health condition. (Doc. # 145 at 12–13.) He concluded that Mr. Partridge has sufficiently alleged at this juncture that his need for accommodation was obvious, and, therefore, that an explicit request for accommodation was unnecessary. (*Id*. at 13–14) (citing *Hans v. Bd. Of Shawnee Cty. C'mmrs*, 775 F. App'x 953, 961 (10th Cir. 2019)) (collecting cases); *see also J.V.*, 813 F.3d at 1299; *Robertson*, 500 F.3d at 1197.

### 2.    Discussion

No party has objected to this portion of the Recommendation. In the absence of a timely objection, "the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers*, 927 at 1167 (citing *Thomas*, 474 U.S. at 150). After reviewing this aspect of the Recommendation, in addition to applicable portions of the record and relevant legal authority, the Court is satisfied that this conclusion is sound and not clearly erroneous or contrary to law. *See* Fed. R. Civ. P.

72(a). As such, the Court affirms Magistrate Judge Varholak's corresponding conclusion that Mr. Partridge's need for an accommodation was obvious and, therefore, an explicit request for accommodation was unnecessary.

**B.      FAILURE TO ACCOMMODATE**

  1. <u>Inadequate Mental Health Care</u>

   *a.* *Magistrate Judge's analysis*

  In its Motion, the Sheriff's Office argues that Mr. Partridge fails to state a reasonable accommodation claim because he relies on allegations that mental health care was inadequate at the Boulder County Jail. (Doc. # 119 at 10.) In determining whether the denial of medical treatment can give rise to an ADA claim, courts have distinguished between allegations of inadequate medical treatment, which generally do not state a claim under the ADA, *see Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001) (collecting cases), and allegations "that a plaintiff was discriminatorily precluded from access to medical treatment altogether," *Hughes*, 594 F. Supp. 2d at 1241 (collecting cases), which may state an ADA claim, *see Rashad*, 4 F. App'x at 560. Magistrate Judge Varholak enumerated several examples of Mr. Partridge receiving medical treatment and, applying the relevant case law, concluded that he was not discriminatorily precluded from access to medical treatment altogether. (Doc. # 145 at 16–17.) Magistrate Judge Varholak thus recommended that Mr. Partridge's ADA and Rehabilitation Act claims fail to the extent they are premised on inadequate treatment of Mr. Partridge's mental health condition. (*Id.* at 17.)

   *b.* *Discussion*

  No party has objected to this aspect of the Recommendation. After reviewing this

aspect of the Recommendation, in addition to applicable portions of the record and relevant legal authority, the Court is satisfied that this conclusion is sound and not clearly erroneous or contrary to law.[1] *See* Fed. R. Civ. P. 72(a). Therefore, the Court affirms Magistrate Judge Varholak's conclusion that Mr. Partridge's ADA and Rehabilitation Act claims fail to the extent they are premised on inadequate mental health treatment and grants the corresponding part of Defendant's Motion.

      2.   <u>Use of Force and Solitary Confinement</u>

      *a.*   *Magistrate Judge's analysis*

Magistrate Judge Varholak concluded that "at this stage of the proceedings, Plaintiff has plausibly pleaded a failure to accommodate ADA claim based on jail staff's interactions with him, including their use of force and solitary confinement." (Doc. # 145 at 17.) In reaching this conclusion, Magistrate Judge Varholak analogized to cases out of the Ninth Circuit that concern the reasonable accommodation of individuals with mental disabilities during arrest and to cases from various circuits that concern reasonable accommodations in the prison context. (*Id*. at 18–20.) Magistrate Judge Varholak wrote:

> The Court is cognizant that the Tenth Circuit has left open the question of whether the ADA requires reasonable accommodations of a disability in the course of an arrest, and has not addressed whether officers must accommodate an individual's disability by ensuring that they do not cause that individual "to suffer greater injury or indignity" than other inmates once the individual is in custody. *Gohier* [*v. Enright*], 186 F.3d [1216,] 1221 [(10th Cir. 1999)]. But in light of the foregoing case law, and because it is clear that the ADA applies to prisoners, *Yeskey*, 524 U.S. at 210, the Court cannot foreclose such a claim at this juncture. Accepting Plaintiff's

---

[1] In the absence of a timely objection, "the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers*, 927 at 1167 (citing *Thomas*, 474 U.S. at 150).

allegations as true, the Court finds that Plaintiff has plausibly pleaded that Defendant caused him greater injury and indignities than other inmates through jail staff's use of force and solitary confinement.

(*Id*. at 20.)

    b. *Defendant's objection*

The Sheriff's Office argues in its Objection that the "plain language of Title II (and the Rehabilitation Act) . . . requires that a plaintiff plead facts which demonstrate exclusion from participation in some service, program or activity" and that Mr. Partridge has failed to plead such exclusion. (Doc. # 146 at 1, 9, 12–13.) Relatedly, it also argues that Magistrate Judge Varholak erred in relying on the "greater injury or indignity" standard in his Recommendation because, in doing so, he disregarded whether the Sheriff's Office withheld a benefit, program, service, or activity from Mr. Partridge. *See* (*id*. at 8–11). Finally, it argues that the instances in which deputies used force against Mr. Partridge fall outside the scope of Title II and the Rehabilitation Act. (*Id*.)

    c. *Discussion*

      i. <u>*Services, benefits, or activities*</u>

This Court's analysis begins with what a plaintiff must allege in order to state a claim under Title II of the ADA. The Sheriff's Office argues that Mr. Partridge must allege exclusion from a service, program, or activity to state a claim. However, under the plain language of the statute, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, **or be subjected to discrimination by any such entity**." 42 U.S.C. § 12132 (emphasis added). In *Gohier v. Enright*, the Tenth Circuit gave effect to the full text of Title II by reiterating that a plaintiff has two

grounds for a Title II claim—i.e., **either** that the plaintiff was excluded from the services, programs, or activities of a public entity **or** that the plaintiff was otherwise subjected to discrimination by said entity.[2] *See* 186 F.3d at 1219.[3] The Court finds that the foregoing clause should be construed to allow a plaintiff to state a claim for discrimination by a public entity without alleging exclusion from a service, program, or activity in order to give effect to the unambiguous statutory language and to avoid rendering the foregoing clause superfluous. Accordingly, the Court disagrees with Defendant's contention that Plaintiff's claims must fail for want of an alleged service, program, or activity to which he was denied access.

However, the Court acknowledges that courts in this circuit and other circuits have narrowed the standard applied to Title II claims to exclude the catch-all phrase "or be subjected to discrimination by any such entity."[4] The Court finds that, even if this

---

[2] The *Gohier* court stated:

> The propriety of the magistrate's ruling really turns on the second step of his analysis: applying very broadly *Amirault* 's comment that police protection is not an individualized benefit of a public entity's "services, programs, or activities," as required by the ADA. Even assuming *arguendo* the correctness of that debatable comment, the problem with the magistrate's approach is that it ignored the second basis for a Title II claim. As noted above, Title II commands that Lucero not "be excluded from participation in or be denied the benefits of the services, programs, or activities of [Colorado Springs], *or* be subjected to discrimination by [Colorado Springs]." 42 U.S.C. § 12132 (emphasis added).

186 F.3d at 1219.

[3] *See also Romero v. Curry Cty. Det. Ctr.*, No. CV01981KBMLCSACE, 2002 WL 35649779, at *6 (D.N.M. Sept. 5, 2002) (adopting plain language standard from *Gohier*); *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) ("[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'") (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *recognized as superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir. 2001)).

[4] *See, e.g.*, *Anderson v. Colo. Dept. of Corrs.*, 848 F.Supp.2d 1291, 1300 (D. Colo. 2012) ("To state a claim under the ADA (and the Rehabilitation Act) a 'plaintiff must allege that: (1) he is a

circuit has departed from the plain language of the statute and does require denial of the benefit of or exclusion from a public entity's services, programs, or activities to state a claim under Title II, Mr. Partridge has plausibly alleged denial of the benefit of or exclusion from prisoner safety and visitation.

First, the Court agrees that safety is a "service" provided by a prison to its prisoners within the meaning of the ADA, as Mr. Partridge contends. (Doc. # 152 at 13.) As the Southern District of New York stated in *Williams v. City of New York*, "[t]he only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative **or custodial capacity** are performing 'services, programs, or activities' within the scope of Title II." 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015) (emphasis added). Although the Tenth Circuit has not decided this question, it intimated in *Gohier* that whether police protection constitutes a service, program, or activity within the meaning of the ADA is, at least, debatable. *See supra* note 1. And, analogously, a prisoner's personal safety has been described as a service provided by a prison in Eighth Amendment jurisprudence. *See, e.g.*, *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (the Eighth Amendment "imposes a duty on prison officials to provide . . . adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm.") (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The Sheriff's Office itself seems to agree with this conclusion in its objection. It states, assuming the legitimacy of the use of force contemplated: "use of force necessarily

qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability.'") (quoting *Robertson*, 500 F.3d at 1193).

implies the jail official is providing a service – that being carrying out the facility's obligations to keep detainees and inmates safe from harm, both from others and themselves." (Doc. # 12 at 14.)

Second, the Court also finds that a prisoner's visitation with his attorney or family qualifies as a service, program, or activity provided by a prison within the meaning of the ADA. Mr. Partridge's allegations indicate that he was denied meaningful access to visitation with his attorney on December 2, 2016, and visitation with his parents on December 8, 2016. *See* (Doc. # 1 at 14, 15).

ii. _The ADA's applicability to uses of force in prison and solitary confinement_

The Court finds no basis to categorically exclude uses of force in the prison context from the scope of the ADA. "There is no dispute that disabled individuals are entitled to reasonable accommodations during detention or incarceration," *Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1214 (D. Colo. 2010) (citing *Robertson*, 500 F.3d at 1194–95), and the Tenth Circuit has repeatedly assumed without deciding that reasonable accommodations related to the use of force may be necessary in the course of an arrest, *see, e.g., J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 (10th Cir. 2015); *Gohier*, 186 F.3d at 1221.[5] Other circuits have held that the ADA applies to arrests and have allowed ADA claims related to arrests to proceed past the

---

[5] The Tenth Circuit has indicated that if a duty to reasonably accommodate a person's disability is created during the course of an arrest, such duty arises only when the arresting officer is aware of the need for an accommodation. *Bernalillo Cty.*, 806 F.3d at 1261 (citing *Robertson*, 500 F.3d at 1196). In the instant case, as discussed above, Mr. Partridge has plausibly alleged that his need for accommodation was obvious and Defendant was aware of that need.

motion to dismiss stage.[6]

Precedent concerning the use of force in the arrest context is instructive in the instant case. In determining whether a defendant law enforcement officer violated the ADA in the course of an arrest, courts consider whether the officer's uses of force against an individual with a disability were objectively reasonable under the circumstances.[7] The Sheriff's Office argues that the ADA does not cover the in-the-moment responses of prison officials. However, the ADA has been applied to the on-the-street responses of officers making an arrest, and officers arguably face more

---

[6] *See, e.g.*, *Lum v. Cty. of San Joaquin*, 756 F. Supp. 2d 1243, 1253 (E.D. Cal. 2010) (denying motion to dismiss the plaintiff's ADA claim, stating "[a]rrests are both subject to the ADA's prohibition against discrimination on the basis of disability and the duty to provide reasonable accommodations during arrests."); *Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (reversing district court's grant of summary judgment for defendant on plaintiff's ADA and Rehabilitation Act claims concerning police conduct during arrest); *Williams*, 121 F. Supp. 3d at 368 (concluding that Title II applies to the investigative and custodial duties of law enforcement officers).

[7] *See, e.g.*, *Gohier*, 186 F.3d at 1218 (officer did not violate the ADA where the plaintiff did not comply with repeated orders to "drop the knife," the officer retreated, the plaintiff lunged at the officer while making stabbing motions, and the officer used force "to defend himself from a perceived threat" and "reasonably thought it was necessary to do so to avoid serious harm or death."); *Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367, 373 (4th Cir. 2000) (finding no ADA violation where officers' uses of force—both before they were aware or should have been aware of the disability and after they were notified of the disability—were objectively reasonable under the circumstances); *Hainze v. Richards*, 207 F.3d 795, 797, 800–801 (5th Cir. 2000) (holding that officer did not violate the ADA, and indicating that force used was reasonable, where the plaintiff was holding a knife, ignored the officer's commands, and approached the officer with a knife); *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1215 (9th Cir. 2014) (holding that the defendant was not entitled to judgment as a matter of law on the plaintiff's ADA claim where the officers could have waited for back up and employed less confrontational tactics in their encounter with the disabled plaintiff), *rev'd in part on other grounds, cert. dismissed in part*, 575 U.S. 600 (2015); *Williams*, 121 F. Supp. 3d at 368 ("Whether a disabled individual succeeds in proving discrimination under Title II of the ADA will depend on whether the officers' accommodations were reasonable circumstances. . . .The City's argument that exigent circumstances may excuse law enforcement officers from providing accommodations fits within this standard; its argument that on-the-street interactions are categorically excluded from Title II coverage does not.") (citing *Waller,* 556 F.3d at 175 and 28 C.F.R. § 35.164) (parenthetical omitted).

uncertainty and risk in the arrest context than in the prison context. For example, if officers used force against Mr. Partridge to make an arrest, those officers might be unaware of his mental health condition and need for an accommodation, suspect he was armed, or suspect he posed a threat to the officers or others. However, in the instant case, Defendant had ample notice of Mr. Partridge's schizophrenia and his deteriorating mental health condition, Mr. Partridge has plausibly pleaded his need for an accommodation was obvious, there is no indication that Mr. Partridge was armed or was suspected of being armed at any point, and on several alleged instances there is no indication that the officers were concerned for their safety or the safety of others.

The Court thus finds no basis for concluding that it may assess the reasonableness of uses of forces in the arrest context but may not even reach that question in the prison context.[8] Instead, it adapts the Southern District of New York's reasoning in *Williams* to conclude that exigent circumstances may excuse prison officials from providing accommodations under the circumstances, but in-the-moment responses of prison officials are not categorically excluded from Title II coverage. *See* 121 F. Supp. at 368. While safety and security issues "are among the legitimate

---

[8] Defendant asserts that the Eastern District of California's decision in *Cortinas v. McDonald* indicates that Mr. Partridge cannot bring an ADA claim based on Defendant's use of force. *See* No. 119CV01276BAMPC, 2019 WL 6528872, at *3 (E.D. Cal. Dec. 4, 2019). However, the plaintiff in *Cortinas* had "not set forth any facts supporting a claim that he is an individual with a disability." *Id*. The Court thus does not find determinative or persuasive the statement that said plaintiff's claims arising "out of an alleged use of excessive force . . . do not provide a basis upon which to impose liability under the ADA or R[ehabilitation Act]." *Id*. This Court is in agreement that a plaintiff who is not a qualifying individual with a disability cannot state an ADA or Rehabilitation Act claim for unreasonable use of force. *Belton v. Miranda-Mares*, 2017 WL 10574067, at *12-14 (C.D. Cal. Mar. 27, 2017) and *Good Voice Elk v. Perrett*, 2013 WL 5954413, at *4 (D.S.D. Nov. 6, 2013), are inapposite for the same reason. Both cases concerned plaintiffs who were not qualified individuals with a disability under the ADA.

contextual factors to consider in determining inmate claims under the ADA/Rehabilitation Act," *Romero*, 2002 WL 35649779, at *9, they do not immunize the actions of prison officials from the ADA.

Accordingly, the Court finds that Mr. Partridge has plausibly pleaded various instances in which Defendant failed to reasonably accommodate him by using an unreasonable amount of force under the circumstances, including, *inter alia*:

- When Mr. Partridge was forcing himself to vomit, officers approached him in full riot gear, pinned him against a wall, put him in a restraint chair, and put a spit sock over his head. (Doc. # 1 at 9.)

- Mr. Partridge began to spit at deputies through a spit sock while his arms and legs were restrained. Sergeant Mitchell tased Mr. Partridge in response. (*Id*. at 8.)

- Officers pulled the blanket off of a naked, sleeping Mr. Partridge to "see if [they] could get him to move." When Mr. Partridge responded erratically and ran toward the cell door, the officers punched and tased him. (*Id*. at 16.)

- After Mr. Partridge allegedly swung at a deputy, the deputy punched him. Once Mr. Partridge was on the ground, one deputy continued to pummel him in the back with "hammer-fist blows" four to five times and two sergeants tased him. (*Id*. at 14.)

- After Mr. Partridge gouged his eyes out, "[e]ven though he was covered in blood, with eyes swollen shut and blind" one deputy slammed Mr. Partridge to the ground and another tased him. (*Id*. at 18.)

- After Mr. Partridge pulled one arm through the food port so only one arm was handcuffed, one deputy punched Mr. Partridge and one sergeant tased him. (*Id.* at 15.)

The Sheriff's Office does not object specifically to Mr. Partridge's argument that it failed to accommodate him through the use of solitary confinement. Given that Mr. Partridge has alleged that his need for an accommodation was obvious, that Defendant had notice of the deleterious effects of solitary confinement on him in particular and on individuals with mental disabilities in general,[9] and that Defendant placed Mr. Partridge in solitary confinement,[10] the Court finds that Mr. Partridge has stated viable reasonable accommodation ADA and Rehabilitation Act claims under this theory as well.

Whether the Sheriff's Office failed to provide Mr. Partridge a reasonable accommodation under the circumstances, through its use of force and solitary confinement, is a question of fact for the jury. *See Tabura v. Kellogg USA*, 880 F.3d 544, 555 (10th Cir. 2018); *see also Bahl v. Cty. of Ramsey*, 695 F.3d 778, 784-85 (8th Cir. 2012) ("The reasonable modification inquiry is highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns.").

---

[9] Plaintiff alleges that a mental health counselor noted that Mr. Partridge reported that "being isolated added to his neurosis" (Doc. # 1 at 13) and that "Defendants continued to let Mr. Partridge languish in solitary confinement – a condition known to not only significantly worsen mental illness but to cause mental illness in people who previously did not suffer from mental illness" (*id.* at 19–20).

[10] Mr. Partridge alleges that "[i]n March 2016, [he] was placed in the Disciplinary, Special Management and Maximum Module at the jail because of his psychotic behavior." (Doc. # 1 at 7.)

3. <u>Failure to Train</u>

    a. *Magistrate Judge's analysis*

Magistrate Judge Varholak concluded that Mr. Partridge's failure to train claim fails to the extent it is premised on deliberate indifference to his mental health but that Mr. Partridge has nevertheless plausibly pleaded a failure to train claim. Magistrate Judge Varholak compared the instant case to *Buben v. City of Lone Tree*, No. 08-CV-00127-WYD-MEH, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010)—in which Judge Daniel denied summary judgment for the defendant on a failure to train ADA claim—and discussed how Mr. Partridge's allegations in the instant case state such a claim.

    b. *Defendant's objection*

The Sheriff's Office argues that the Tenth Circuit has yet to recognize a failure to train claim under the ADA. It further argues that Mr. Partridge cannot state a failure to train claim if he has not pleaded a plausible underlying ADA violation and that he has not alleged that "any training deficiency resulted in his being excluded from any services provided by the Jail or that he was treated differently as a result of his disability." (Doc. # 146 at 15–16.) Lastly, the Sheriff's Office argues that Mr. Partridge's allegations do not support a failure to train claim related to use of force because they are conclusory and relate only to his now-dismissed theory that the jail was deliberately indifferent to his mental health needs. (*Id*. at 16.)

    c. *Discussion*

As the Sheriff's Office notes, the Court of Appeals for the Tenth Circuit has not yet recognized a failure to train claim under the ADA, but it has not foreclosed the possibility of such a claim. *See J.V.*, 813 F.3d at 1297. In *Gohier*, the Tenth Circuit

noted that the plaintiff "might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability," but it did not decide whether such a claim exists because that argument was not before the court. 186 F.3d at 1222. Likewise, in *Sperry v. Maes*, the Tenth Circuit dismissed the plaintiff's failure to train ADA claim without deciding whether such a claim exists because the plaintiff had not "demonstrated the 'deliberate indifference' required to prove a failure-to-train claim by showing that the [defendant municipality] was 'on notice' of the need for 'more or different training.'" 592 F. App'x 688, 698 (10th Cir. 2014) (quoting *City of Canton, Ohio*, 489 U.S. at 390, 397).

However, the District of Colorado recognized such an ADA claim for failure to train in *Buben v. City of Lone Tree*, 2010 WL 3894185, at *12. In *Buben*, Judge Daniel held "that Plaintiff may go forward with its ADA claim based on his allegations that Lone Tree should have adopted polices to accommodate disabled individuals such as Plaintiff, and should have properly trained its officers to recognize and reasonably accommodate individuals exhibiting signs of 'excited delirium,' mental illness or disability." *Id*. Judge Daniel denied the defendant's motion for summary judgment as to the plaintiff's Title II claim on that basis. The Court finds Judge Daniel's reasoning in *Buben* to be persuasive in the instant case and finds that Judge Daniel's reasoning at summary judgment applies with even more force here as Plaintiff's burden is significantly lower at the motion to dismiss stage.

At this juncture, Mr. Partridge has satisfied his burden to show that the Sheriff's Office committed an underlying Title II or Rehabilitation Act violation, as discussed above. *See Trujillo*, 319 F.R.D. at 617. Additionally, he has satisfied his burden to show that the Sheriff's Office was "'on notice' of the need for 'more or different training.'" *Sperry*, 592 F. App'x. at 698. He has alleged that supervisory personnel at the Boulder County Jail have publicly admitted they cannot handle mentally ill inmates, including Sergeant Mitchell's statement that "[w]e're deputies, not mental health specialists. Some of the hardest decisions we make currently are in housing our mental health population . . . ." *See* (Doc. # 1 at 22–23). In addition, Mr. Partridge's allegations concerning officers' unreasonable uses of force against him lend circumstantial support to his failure to train claim. The Court agrees with Magistrate Judge Varholak's opinion that Plaintiff's allegations of the "officers' violent or punitive conduct in response to Plaintiff lying naked and unresponsive in his cell, forcing himself to vomit, and gouging his eyes out" "demonstrate that they were ill-equipped to handle interactions with mentally ill inmates." (Doc. # 145 at 26.) Mr. Partridge has, therefore, plausibly pleaded that the Sheriff's Office failed to sufficiently train its officers on how to interact with and accommodate individuals with disabilities, particularly individuals with mental disabilities.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED as follows:

- The December 3, 2019 Recommendation of United States Magistrate Judge (Doc. # 145) is AFFIRMED and ADOPTED as an Order of this Court;

- Defendant Boulder County Sheriff's Office's Motion for Judgment on the Pleadings (Doc. # 119) is GRANTED IN PART as to its argument that Plaintiff's ADA and Rehabilitation Act claims fail to the extent they are premised on inadequate mental health treatment and DENIED IN PART as to the remainder of the Motion; and

- Claims Eleven and Twelve, i.e., Plaintiff's ADA and Rehabilitation Act claims, proceed to the extent they are not premised on inadequate mental health treatment.

DATED: February 25, 2020

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge